214 Cal.App.3d 878 (1989)
263 Cal. Rptr. 64
ANNAMARIE E. IBRAHIM et al., Plaintiffs and Appellants,
v.
FORD MOTOR COMPANY, Defendant and Respondent.
Docket No. A040454.
Court of Appeals of California, First District, Division Four.
October 13, 1989.
*882 COUNSEL
Kemnitzer, Dickinson, Anderson & Barron, Roger Dickinson, Bryan Kemnitzer and Nancy Barron for Plaintiffs and Appellants.
Richard A. Elbrecht, Mary-Alice Coleman and John C. Lamb as Amici Curiae on behalf of Plaintiffs and Appellants.
Edson & LaPlante and John M. LaPlante for Defendant and Respondent.
OPINION
POCHE, Acting P.J.
California has adopted a variety of statutes, including the so-called "Lemon Law," which may be used by the dissatisfied purchaser of a new motor vehicle. We reverse the judgment before us because of instructional error that largely nullified the effectiveness of those statutes.

BACKGROUND
In May of 1984 plaintiff Annamarie E. Ibrahim[1] executed a contract for the purchase of a new Mercury Cougar from the Larry Albedi Motors dealership. Mrs. Ibrahim made a down payment of $3,000; the remainder of the purchase price of $12,315.96 was financed through a credit union. A document entitled "Ford Warranty Information" provided by defendant Ford Motor Company to plaintiff at the time of the purchase embodied Ford's express warranty that the "selling Dealer will repair, replace, or adjust parts, except tires, on 1984 Ford Motor Company cars ... found to be defective in factory materials or workmanship made or supplied by Ford" which develop during the following 12 months or 12,000 miles, "whichever occurs earlier."
Plaintiff soon had need of this warranty. According to plaintiff's testimony at trial, mechanical problems were noticeable literally from the moment she accepted delivery of the vehicle. From June to October of 1984 plaintiff returned her Cougar to the dealer no less than eight times. A number of parts, ranging from engine belts to the A-frame, had to be replaced. All but one of plaintiff's complaints were resolved to her satisfaction without *883 charge. The exception was the tendency of the vehicle's engine to surge or die unexpectedly. This problem figured in each of plaintiff's return trips up to October 17th (which, because the vehicle had been driven 11,760 miles, appears to have been the last visit prior to expiration of the express warranty quoted above). Despite the best efforts of the dealer, this problem persisted. By the time plaintiff's vehicle was returned to her on October 20th, it had been in the dealer's repair facility for approximately 55 days.
Twice more, once in November and once in December of 1984, plaintiff returned the vehicle to the dealer with complaints of the erratic engine. Although the details are unclear, it appears that about this time Ford was informed of the problem. After approximately 30 more days with the dealer, which was still honoring the express warranty despite the odometer showing more than 12,000 miles, the problem remained uncorrected. According to plaintiff, if anything it got worse. After a harrowing experience when the Cougar died while passing over railroad tracks, plaintiff decided she had had enough.
In early 1985 plaintiff asked the Ford Consumer Appeals Board (FCAB)[2] for a full refund of the purchase price. In March of that year plaintiff made arrangements for the vehicle to be inspected by Ford representatives at the Albedi dealership. The Ford people failed to keep the appointment. Plaintiff thereafter refused to make the vehicle available in order that Ford personnel could attempt to repair the difficulty (as opposed to conducting an inspection, which plaintiff would allow). In July the FCAB made a final decision denying plaintiff's refund request. Because she was pregnant and convinced that the Cougar was unsafe to drive, plaintiff in July used all of her savings to buy another vehicle. It appears that the Cougar ceased functioning as plaintiff's primary means of transportation, although it was driven occasionally. Plaintiff continued making payments to the credit union.
Plaintiff commenced this action in October of 1985 by filing a verified "Complaint For Rescission, Restitution And Damages, Breach Of Express And Implied Warranties, Fraud And Negligent Misrepresentation" against *884 Ford in October of 1985.[3] She alleged causes of action for breach of express and implied warranties of fitness and merchantability according to the Song-Beverly Consumer Warranty Act (Civ. Code, § 1790 et seq.),[4] the California Uniform Commercial Code, and the Magnuson-Moss Consumer Warranty Act (15 U.S.C. § 2310 et seq.). Plaintiff also alleged causes of action for fraud, negligent misrepresentation, and breach of the covenant of good faith and fair dealing.
The six-person jury returned a unanimous verdict for Ford. After the trial court denied plaintiff's motion for a new trial, she filed a timely notice of appeal from the judgment entered on the verdict.

REVIEW
Consumer dissatisfaction with new motor vehicles whose performance on the road differs from the representations made on the showroom floor is a long-standing problem. Some relief was afforded by the adoption of the Uniform Commercial Code, and by the passage of the Magnuson-Moss Act by Congress in 1974. Eight years later the California Legislature augmented this federal lead by adding to the Song-Beverly Act the so-called "Lemon Law," now section 1793.2,[5] which formed the basis of plaintiff's claims for rescission, damages, and attorneys' fees. Plaintiff, joined by the Director of the Department of Consumer Affairs as amicus, contends that the trial court committed prejudicial instructional error with respect to the operation and effect of section 1793.2 and the warranty provisions of the Uniform Commercial Code. We will examine the various aspects of this contention separately.

Section 1793.2
Section 1793.2 embodies several features of the Song-Beverly Act's comprehensive regulation of expressly warranteed consumer goods. Subdivision (a) requires "[e]very manufacturer of consumer goods sold in this state and for which the manufacturer has made an express warranty" to make arrangements for "sufficient service and repair facilities ... to carry out the terms of such warranties...." Subdivision (b) specifies that "service or repair" of goods which "do not conform with the applicable express warranties *885 ... shall be commenced within a reasonable time by the manufacturer," and the service or repair must be completed within 30 days "[u]nless the buyer agrees in writing to the contrary." Subdivision (c) states the general rule that the buyer is responsible for delivering nonconforming goods to the manufacturer for service or repair, and deals with situations where "due to reasons of size and weight" of the goods this general rule does not operate.
Subdivision (d) provides: "Should the manufacturer or its representative in this state be unable to service or repair the goods to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either replace the goods or reimburse the buyer in an amount equal to the purchase price paid by the buyer, less that amount directly attributable to use by the buyer prior to the discovery of the non-conformity."
Subdivision (e) expands upon subdivision (d), with particular reference to "new motor vehicles."[6] Subdivision (e)(1) provides: "It shall be presumed that a reasonable number of attempts have been made to conform a new motor vehicle to the applicable express warranties if, within one year from delivery to the buyer or 12,000 miles, whichever occurs first, either (A) the same nonconformity has been subject to repair four or more times by the manufacturer or its agents and the buyer has at least once directly notified the manufacturer of the need for the repair of the nonconformity, or (B) the vehicle is out of service by reason of repair of nonconformities by the manufacturer or its agents for a cumulative total of more than 30 calendar days since delivery of the vehicle to the buyer. The 30-day limit shall be extended only if repairs cannot be performed due to conditions beyond the control of the manufacturer or its agents. The buyer shall be required to directly notify the manufacturer pursuant to subparagraph (A) only if the manufacturer has clearly and conspicuously disclosed to the buyer, with the warranty or the owner's manual, the provisions of this subdivision and that of subdivision (d), including the requirement that the buyer must notify the manufacturer directly pursuant to subparagraph (A). This presumption shall be a rebuttable presumption affecting the burden of proof in any action to enforce the buyer's rights under subdivision (d) and shall not be construed to limit those rights."
To recap: subdivision (d) establishes a substantive rule of general application  the manufacturer is obligated either to replace or to reimburse the *886 buyer if "the manufacturer or its representative in this state [are] unable to service or repair the goods to conform to the applicable express warranties after a reasonable number of attempts." Subdivision (e) establishes a pair of standards establishing reasonableness within the particular area of new motor vehicles  the vehicle is out of service for more than 30 calendar days, or the same problem has been the subject of at least four attempts at repair by "the manufacturer or its agents." (1) Neither 30 days in the shop nor 4 unsuccessful attempts at repairing a problem conclusively proves an entitlement to the remedy alternatives of subdivision (d). Replacement or reimbursement is still dependent upon "a reasonable number of attempts" to conform the vehicle to the warranty. The dual criteria of subdivision (e) simply embody the Legislature's decision to declare presumptive standards of what is "reasonable" for purposes of subdivision (d). The issue of whether the manufacturer has made a reasonable number of attempts to conform the product to the warranty remains to be resolved. Unreasonableness may still be found even if a new vehicle has been out of service for less than 30 days or if there have been fewer than four attempts to repair the same problem. By enacting subdivision (e) the Legislature has not decreed a per se, valid-in-all-circumstances, money-back guaranty for every purchaser whose new automobile has spent 30 days at the dealership for repairs, or who has suffered through four attempts to fix a problem; these are only markers on the path of reasonableness that the trier of fact must trod.
Within the framework of BAJI No. 2.60 ("Burden of Proof and Preponderance of Evidence") as spelled out with reference to various sections of the Song-Beverly Act, the trial court instructed the jury as follows: "Plaintiffs have the burden of establishing, against defendant, by a preponderance of the evidence all facts necessary to prove each of the following elements:
"That plaintiffs were the purchasers of a motor vehicle; that in connection with the purchase of a motor vehicle, Ford gave a written warranty that the vehicle was covered from defects in factory materials or workmanship. Ford here provided a new vehicle limited warranty, which provides in pertinent part:
"`Ford Motor Company warrants that you[r] selling dealer will repair, replace, or adjust parts, except tires, on 1984 Ford Motor Company cars and light trucks, found to be defective in factory materials or workmanship made or supplied by Ford in twelve months or 12,000 miles, whichever occurs earlier.'
"That plaintiffs relied on that written statement;
"That the vehicle contained a defect covered by the warranty;
*887 "That the defect substantially impaired the use, value or safety of the vehicle;
"That plaintiffs, upon discovery of the defect in the motor vehicle, delivered the motor vehicle to defendant, Ford Motor Company, for repair;
"That defendant thereafter failed to repair the defect after a reasonable number of attempts;
"That such failure was not caused by conditions beyond the control of the defendant;
"The nature [and] extent of damages suffered by plaintiffs was a proximate result of defendant's failure to meet its legal obligations....
"The defendant, Ford Motor Company, of course, in this case, has the burden of establishing by a preponderance of the evidence the following:
"Ford did not have a reasonable number of repair attempts."
(2) The first of plaintiff's objections can be dealt with briefly. Plaintiff argues that the use of the term "defect" instead of the statutory term "nonconformity" operated to "mislead the jury into believing that they had to find the vehicle was unsafe in design or manufacture as in a products liability setting rather than simply nonconforming to the warranty after a reasonable number of repair attempts." Certainly it would have been better practice to instruct the jury with the statutory language. Nevertheless, the substitution of "defect" in place of "nonconformity" furnishes no basis for reversal. True, defect is a term of art within the law of products liability, but hardly one whose mere mention would mislead. The general context of the instruction was confined to warranties and in no way suggested importation of the law of products liability. Song-Beverly does provide a definition of "nonconformity," but one that is of scant assistance: "`Nonconformity' means a nonconformity which substantially impairs the use, value, or safety of the new motor vehicle." (§ 1793.2, subd. (e)(4)(A).) This definition is nothing more than a means of describing what the average person would understand to be a defect. The two words are in effect synonyms. Certainly counsel for both sides so treated them.[7] If anything, it is quite possible that the court's use of the shorter word improved the jury's ability to understand the substance of the instructions. In any event, during the course of *888 instructing the jury with paraphrasings of subdivisions (d) and (e) the trial court did provide the statutory definition of "nonconformity" to the jury. If there was error, it was unquestionably harmless. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475; People v. Watson (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)
(3a) Not so benign a conclusion is possible with respect to those portions of the instructions which dovetailed with Ford's primary defense  that the replace or refund provisions of subdivisions (d) and (e) were not activated until Ford, not the dealership, had at least one opportunity to repair plaintiff's vehicle. This misimpression was transmitted by the instructions in several ways. The jury was told that plaintiff had the burden of proving that she "delivered the motor vehicle to defendant, Ford Motor Company, for repair," that "defendant thereafter failed to repair the defect after a reasonable number of attempts," and that "such failure was not caused by conditions beyond the control of defendant." (Italics added.) Conversely, Ford had the burden of establishing that "Ford did not have a reasonable number of repair attempts." (Italics added.)
Very clearly, these instructions told the jury that the previous repair efforts of the Albedi dealership were not to be considered for the purpose of deciding plaintiff's entitlement to reimbursement of the purchase price pursuant to subdivisions (d) and (e). The legislative history of these provisions demonstrates beyond any question that such a differentiation between manufacturer and local representative is unwarranted.
As of 1981, section 1793.2 concluded with subdivision (d), which provided: "Should the manufacturer or its representative in this state be unable to service or repair the goods to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either replace the goods or reimburse the buyer in an amount equal to the purchase price paid by the buyer, less that amount directly attributable to use by the buyer prior to the discovery of the nonconformity." (See 1978 Stats. ch. 991, § 7, p. 3062.) In that year Assemblywoman Tanner introduced Assembly Bill No. 1787, which would have amended subdivision (d) by adding the presumption of reasonableness now found in subdivision (e). The original bill would have given the buyer the benefit of the presumption if "the same nonconformity has been subject to repair 3 or more times by the dealer, and one time by the manufacturer." (Assem. Bill No. 1787 (1981-1982 Reg. Sess.) § 1 [italics added].) The bill was subsequently amended in the Assembly to refer to a single total repair effort "by the manufacturer or its agents." (Assem. Amend. to Assem. Bill No. 1787 (1981 Reg. Sess.) Apr. 22, 1981.) The changes to subdivision (d) were ultimately adopted as what is now subdivision (e). (See 1982 Stats. ch. 388, § 1, pp. 1721-1723.)
*889 The Legislature's rejection of precise language favorable to Ford's position demonstrates beyond any possible doubt that the instructions were based upon a false and legally erroneous construction of subdivisions (d) and (e). (See Ford Motor Co. v. County of Tulare (1983) 145 Cal. App.3d 688, 692 [193 Cal. Rptr. 511].) Those provisions treat the manufacturer and its "representative[s] in this state" (the term used in subdivision (d)) or "agents" (the term used in subdivision (e)) as a single entity, the repair efforts of both being aggregated for the purpose of calculating whether "the same nonconformity has been subject to repair four or more times."[8] The instructions thus had a pronounced potential for misinforming the jury that Ford could not be required to reimburse plaintiff unless and until Ford, notwithstanding the Albedi dealership's previous efforts on Ford's behalf, had been given at least one opportunity to fix the problem itself. Section 1793.2 has no such requirement.
These incorrect instructions were also in direct conflict with other instructions. Immediately before hearing these instructions the jury had been told by the trial court that plaintiff had the burden of proving that she "delivered the automobile to defendant or its authorized repair facility" and that "[d]efendant or its authorized repair facility" failed to repair the automobile within a reasonable period of time, or within a reasonable number of attempts and failed or refused to replace the vehicle or reimburse the purchase cost of the vehicle." (Italics added.)
Immediately after the instructions quoted above, the trial court instructed the jury with paraphrased excerpts of subdivisions (d) and (e). The jury was first told "Should the manufacturer be unable to service or repair the automobile to conform to the applicable express warranty after a reasonable number of attempts, you shall find that Ford is required either to replace the vehicle or reimburse the buyers...." (Italics added.) The jury was then instructed "It shall be presumed that a reasonable number of attempts have been made to conform a new motor vehicle to the applicable express warranty if, within one year from delivery to the buyer or 12,000 miles, whichever first occurs, either the same non-conformity has been subject to repair four or more times by the manufacturer or its agents and the buyer has at least once directly notified the manufacturer of the need for the repair of the non-conformity, or the vehicle is out of service by reason of repair of non-conformities by the manufacturer or its agents for a cumulative total of more than thirty calendar days since delivery of the vehicle to the buyer. [¶] The 30-day limit shall be extended only if repairs cannot be performed due *890 to conditions beyond the control of the manufacturer or its agents."[9] (Italics added.)
Thus the jury was subjected to a roller coaster of conflicting instructions. First, attention was directed to Ford and Albedi, then to Ford alone, then back to Ford and Albedi together, all within the context of what the Song-Beverly Act required for recovery.
(4) Several other burden of proof errors were committed. As previously described, one of the ways in which the presumption of subdivision (e) comes into play is if the vehicle was "out of service by reason of repair of nonconformities by the manufacturer or its agents for a cumulative total of more than 30 calendar days since delivery of the vehicle to the buyer." Subdivision (e) specifies that "[t]he 30-day limit shall be extended only if repairs cannot be performed due to conditions beyond the control of the manufacturer or its agents." The trial court instructed the jury that plaintiff had the burden of proving that Ford's failure "to repair the defect after a reasonable number of attempts ... was not caused by conditions beyond the control of the defendant." Plaintiff and amicus justifiably assert that it was error to assign her this burden.
Plaintiff's evidence sufficed to activate the presumption of subdivision (e), which the Legislature explicitly declared to be "a rebuttable presumption affecting the burden of proof." The effect of such a presumption "is to impose upon the party against whom it operates the burden of proof as to the nonexistence of the presumed fact." (Evid. Code, § 606.) The presumption established by subdivision (e) operates against Ford. By claiming an extension of the 30-day period, Ford was obliged to carry the burden of proof. Error occurred when the jury was instructed otherwise.
After reading from the "Warranty Information" provided to plaintiff this statement  "Ford Motor Company warrants that you[r] selling dealer will repair, replace, or adjust parts, except tires, on 1984 Ford Motor Company cars and light trucks, found to be defective in factory materials or workmanship made or supplied by Ford in twelve months or 12,000 miles, whichever occurs earlier"  the court instructed the jury that plaintiff had the burden of proving that she "relied on that written statement." This too was error, because Ford, not plaintiff, had the burden of proving nonreliance. (See Keith v. Buchanan (1985) 173 Cal. App.3d 13, 22-23 [220 Cal. Rptr. 392]; Deering's Ann. Cal. U. Com. Code, § 2313 (1986 ed.) p. 108, West's Ann. Cal. U. Com. Code (1964 ed.) p. 249; cf. Seely v. White *891 Motor Co. (1965) 63 Cal.2d 9, 13 [45 Cal. Rptr. 17, 403 P.2d 145] ["The reliance on the warranty ... [is] manifested by plaintiff's continued efforts to have the truck repaired, and by defendant's acceptance of the responsibility to correct the [problem]"].)[10]
(5) Finally, plaintiff sees error in an instruction which did not deal with the burden of proof issues. The trial court instructed the jury with the language of subdivision (e) concerning the requirement of direct notification from the buyer to the manufacturer with respect to a recurring nonconformity. Subdivision (e) makes it plain, however, that this is a contingent obligation which does not necessarily affect the presumption created by subparagraph (A): "The buyer shall be required to directly notify the manufacturer pursuant to subparagraph (A) only if the manufacturer has clearly and conspicuously disclosed to the buyer, with the warranty or the owner's manual, the provisions of this subdivision and that of subdivision (d), including the requirement that the buyer must notify the manufacturer directly pursuant to subparagraph (A)." As a matter of law the "Warranty Information" (quoted at fn. 2, ante) furnished to plaintiff by Ford does not satisfy this requirement of conspicuous disclosure. Although Ford suggests that the requisite information is in the owner's manual, the manual was not admitted in evidence. (6) "[I]t is improper to give an instruction which lacks support in the evidence, even if the instruction correctly states the law" (LeMons v. Regents of University of California (1978) 21 Cal.3d 869, 875 [148 Cal. Rptr. 355, 582 P.2d 946]), which this instruction did.
(7) It remains to be decided whether these errors are prejudicial. This calls for an assessment of whether the totality of circumstances demonstrates a probability that the erroneous instructions were likely to mislead the jury and become a factor in its verdict. (LeMons v. Regents of University of California, supra, 21 Cal.3d 869 at pp. 875-876; Henderson v. Harnischfeger Corp. (1974) 12 Cal.3d 663, 670 [117 Cal. Rptr. 1, 527 P.2d 353]; Bracisco v. Beech Aircraft Corp. (1984) 159 Cal. App.3d 1101, 1107 [206 Cal. Rptr. 431].)
(3b) The crucial issue before the jury was whether the problem afflicting plaintiff's Cougar persisted after a reasonable number of attempts to correct it, triggering the replacement or refund provision of the Lemon Law. The key to resolving that issue was whether Ford passed or failed the test of *892 reasonableness. Plaintiff was obviously relying on the presumption established by subdivision (e). Ford's primary defense was that it, without respect to the dealer's repair attempts, was entitled to have at least one opportunity to correct the nagging nonconformity of plaintiff's vehicle before it could be required to refund plaintiff's purchase price. Embodying this erroneous construction of section 1793.2, the instructions at several points placed the burden on plaintiff of proving that she had "delivered the motor vehicle to defendant, Ford Motor Company, for repair," which, strictly speaking, plaintiff never did. As has been shown, section 1793.2 was specifically intended not to impose such a burden. It is true that certain other instructions might be viewed as curing this error, but their ameliorative effect is substantially lessened because they were not linked to which party had the burden of proof. The prejudicial effect of conflicting instructions, some of which involved a misstatement of a principle of law as important as which party had the burden of proving fundamental issues in dispute, is not easily surmounted. (See Henderson v. Harnischfeger Corp., supra, 12 Cal.3d 663 at p. 673; Bracisco v. Beech Aircraft Corp., supra, 159 Cal. App.3d 1101 at p. 1108.)
By instructing that plaintiff had the burden of proving that Ford's failure "to repair the defect after a reasonable number of attempts ... was not caused by conditions beyond the control of the defendant," the trial court (1) assigned plaintiff the burden concerning an issue which Evidence Code section 606 required Ford to prove and (2) reemphasized the erroneous impression that Ford could not be found liable unless and until it had been given at least one attempt to fix the problem with the consumer good it had manufactured, thus discounting the repair efforts made by the Albedi dealership on Ford's behalf. Further error occurred when the jury was instructed that plaintiff had the burden of proving her reliance on Ford's express warranty, and in connection with the direct notification requirements of subdivision (e). Although the matters of plaintiff's reliance and any direct notification by her to Ford did not figure as disputed issues, their irrelevance could at best only have added further confusion. More ominously, the matter of direct notification by plaintiff could well have diminished the jury's attention to plaintiff's entitlement to the presumption established by subdivision (e).
The misimpressions created by the instructional errors were hammered home by the argument of Ford's counsel. Counsel told the jury: "My only burden under the law, the Judge will instruct you, is to show that Ford did not have a reasonable number of repair attempts. ... [T]he law says, `I, Ford, I'm the manufacturer. I made the promise, why don't I get a chance to fix the car'? ... What was bad that Ford Motor Company did in this case? I tell you what they're going to say: `They didn't give them a new car.' *893 But doesn't that go back to the issue, don't we get a chance to try to fix your car first? Not even [] one repair attempt? And the law says we're entitled to reasonable repair attempt. And they're going to say, `Yeah, but the Albedi dealership did it.' [¶] And I'm going to say, `You're doggone right, and they're not here, and I can't defend them.... But before you want me to be punished, why don't I, as a matter of fairness, just plain fairness, get a chance.'" (Italics added.) We are satisfied there is a reasonable probability that the erroneous instructions were a factor in jury's decision to return the verdict in favor of Ford. The net effect of those instructions falsely provided the appearance of statutory fortification to Ford's alluring defense of "just plain fairness." Correct instructions could have blown the bottom out of that defense. With due regard for all of the circumstances,[11] we conclude that the cumulative impact of these errors (and others discussed post) requires reversal of the judgment.

Civil Penalty
The Song-Beverly Act provides that "[a]ny buyer of consumer goods who is damaged by a failure to comply with any obligation under this chapter or under an implied or express warranty ... may bring an action for the recovery of damages and other legal and equitable relief." (§ 1794, subd. (a).) It further provides that "[i]f the buyer establishes that the failure to comply was willful, the judgment may include, in addition to the amounts recovered under subdivision (a), a civil penalty which shall not exceed two times the amount of actual damages." (§ 1794, subd. (c).) (8) With respect to plaintiff's claim for such civil penalty, the jury was instructed in these terms: "If plaintiffs establish that they were damaged by the failure of the defendant to comply with the obligations imposed upon it by the Song-Beverl[]y Consumer Warranty Act, as to which I have instructed you earlier, your judgment may include the award of a civil penalty if you find the defendant's failure to fulfill its obligations under the law was willful. If you decide defendant acted willfully, you may assess a civil penalty against defendant for any amount you deem appropriate, but such civil penalty cannot exceed two times the amount which you determine to be plaintiff's actual damages.
"`Willful' as used in these instructions means something more blameworthy than the sort of misconduct involved in ordinary negligence, and something more than the mere intentional doing of an act constituting such negligence.
*894 "`Willful' connotes such an act which is undertaken with either a knowing or reckless disregard of the rights of the consumer in failing to comply with the obligations under the express or implied warranty."
Plaintiff sees error in the definition of "willful" used in the instructions, and in the failure to tell the jury that a civil penalty could be awarded by reason of Ford's noncompliance with its obligations pursuant to either the Song-Beverly Act or a warranty. Only the first of these points can be sustained.
More than a decade ago our Supreme Court held "it is well settled that the terms `willful' or `willfully,' when applied in a penal statute, require only that the illegal act or omission occur `intentionally,' without regard to motive or ignorance of the act's prohibited character." (Hale v. Morgan (1978) 22 Cal.3d 388, 396 [149 Cal. Rptr. 375, 584 P.2d 512] and authorities cited.)[12] The statutory concept of willfulness does not include the moral component, conveyed in the instructions by such words as "blameworthy" and "reckless disregard of the rights of the consumer," associated with the oppression, fraud, or malice required by section 3294 for the recovery of punitive damages. Conduct can be willful when unaccompanied by "a deliberate evil purpose." (See Goodhew v. Industrial Acc. Com. (1958) 157 Cal. App.2d 252, 257 [320 P.2d 515]; Davis v. Morris (1940) 37 Cal. App.2d 269, 274 [99 P.2d 345].) "In civil cases, the word `willful,' as ordinarily used in courts of law, does not necessarily imply anything blamable, or any malice or wrong toward the other party, or perverseness or moral delinquency, but merely that the thing done or omitted to be done was done or omitted intentionally. It amounts to nothing more than this: That the person knows what he is doing, intends to do what he is doing, and is a free agent." (May v. New York M. Picture Corp. (1920) 45 Cal. App. 396, 404 [187 P. 785]; accord Goodhew v. Industrial Acc. Com., supra; Wilson v. Security-First Nat. Bank (1948) 84 Cal. App.2d 427, 431 [190 P.2d 975]; Davis v. Morris, supra.)
The instructions should have told the jury that a civil penalty could be awarded to plaintiff if the jury determined that Ford knew of its obligations but intentionally declined to fulfill them. Instead, the jury's attention was confused with language which virtually compelled a wholly extraneous moral assessment of Ford's conduct. The trial court would have been better advised to have used the instructions proposed by plaintiff.[13]
*895 Plaintiff's second point is more troublesome. The instructions began by linking a possible civil penalty to the issue of whether Ford failed "to comply with the obligations imposed upon it by the Song-Beverly Consumer Warranty Act." Yet in defining what was willful the court spoke of Ford's failure "to comply with the obligations under the express or implied warranty." As has been shown, both of these obligations are covered by section 1794, which premises awards of civil penalties on "a failure to comply with any obligation under this chapter [the Song-Beverly Act] or under an implied or express warranty." (Italics added.) Although the court made a passing mention to the Song-Beverly Act "as to which I have instructed you earlier," the jury was never expressly told that a civil penalty could be awarded if the jury found that Ford had failed to satisfy the obligations imposed by Song-Beverly and the applicable warranties. Nevertheless, the instructions as a whole, because they included references to obligations derived from the Song-Beverly Act and the warranties, could well be seen as advising the jury that both were to be considered. This ambiguity can be corrected in the event of a retrial.

Continued Use as Waiver of the Right to Revoke Acceptance
One of the more heated points of dispute between the parties was whether plaintiff had revoked her acceptance of the Cougar. Evidence that plaintiff had continued to drive the vehicle for a total of about 28,000 miles before parking it behind the Albedi dealership in April of 1986, yet had continued to make payments to the credit union, gave both sides ammunition. The trial court instructed the jury as follows: "Plaintiffs contend that they revoked their acceptance of this particular vehicle that they purchased from Albedi Motors. To establish a revocation, plaintiffs have the burden of proving, by a preponderance of the evidence, each of the following elements:
"That the revocation was justified because there was a non-conformity which substantially impaired the value of the vehicle to plaintiffs;
"On the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or
"Without discovery of such non-conformity if his [sic] acceptance was reasonably induced either by the seller's assurances.
*896 "And fourth, the revocation was made before there was any substantial change in the condition of the vehicle, not caused by its own defects; and
"Plaintiffs notified defendant of the revocation of acceptance.
"As used in these instructions, the term `goods' means any personal property.... This includes, of course, the 1984 Cougar involved in this case.
"Acceptance of goods occurs when a buyer either fails to make an effective rejection after having a reasonable opportunity to inspect, or does any act inconsistent with the seller's ownership, such as continued use.
"Once the buyer has accepted the goods, he or she is precluded from rejecting them. After acceptance, the buyer may avoid the sale only by an effective revocation, and acceptance with knowledge of non-conformities impairs the ability to revoke acceptance for thos[e] non-conformities.
"A buyer's continued use of allegedly defective goods, in addition to constituting an acceptance, may operate to preclude a revocation of acceptance. A buyer loses his right to rescind a contract for breach of warranty for failure of goods to conform to the contract if he uses it as his own property, for his own benefit or convenience, after acquiring knowledge of the grounds for re[s]cis[s]ion.
"If a buyer decides to revoke acceptance, timely notice must be given to the seller. Revocation must occur before any substantial change in the condition of the goods not caused by its own defects. Revocation of acceptance is not effective until the buyer notifies the seller of it."
These instructions were based in large part on provisions of the Uniform Commercial Code,[14] but a considerable body of related common law is also *897 involved. It is primarily the latter source which demonstrate several possible legal deficiencies of the instructions.
The issue of continued use is essentially the waiver of the right to rescind seen from a different perspective. Prior to enactment of the statutory remedies invoked by plaintiff, California's approach to such a waiver was clear. "The right to rescind may be waived.... Waiver of a right to rescind will be presumed against a party who, having full knowledge of the circumstances which would warrant him in rescinding, nevertheless accepts and retains benefits accruing to him under the contract." (Neet v. Holmes (1944) 25 Cal.2d 447, 458 [154 P.2d 854].) Whether the right was waived is generally a question of fact (id. at p. 459; Loughan v. Harger-Haldeman (1960) 184 Cal. App.2d 495, 503 [7 Cal. Rptr. 581]; Soderling v. Tomlin (1959) 170 Cal. App.2d 169, 173 [338 P.2d 946]; Esau v. Briggs (1948) 89 Cal. App.2d 427, 437 [190 P.2d 975]), and the party urging waiver has the burden of proving it. (Flash Cleaners v. Columbia Appliance (1957) 156 Cal. App.2d 455, 459 [319 P.2d 454]; Mayer v. Northwood Textile Mills (1951) 105 Cal. App.2d 406, 409 [233 P.2d 657]; Mobley v. Richfield Oil Corp. (1942) 53 Cal. App.2d 406, 411 [128 P.2d 105].)
Within the context of the California Uniform Commercial Code courts around the country are in general agreement that reasonable continued use of motorized vehicles does not, as a matter of law, prevent the buyer from asserting rescission (or its U.Com.Code equivalent, revocation of acceptance). (See Mobile Home Sales Manage. Inc. v. Brown (1977) 115 Ariz. 11 [562 P.2d 1378]; Ozark Kenworth, Inc. v. Neidecker (1984) 283 Ark. 196 [672 S.W.2d 899]; Keen v. Modern Trailer Sales, Inc. (1978) 40 Colo. App. 527 [578 P.2d 668]; Conte v. Dwan Lincoln-Mercury, Inc. (1976) 172 Conn. 112 [374 A.2d 144]; Johnson v. General Motors Corp. (1983) 233 Kan. 1044 [668 P.2d 139]; Johannsen v. Minn. Valley Ford Tractor Co. (Minn. 1981) 304 N.W.2d 654; Lawrence v. Modern Mobile Homes, Inc. (Mo. App. 1978) 562 S.W.2d 729; Countryside Mobile Homes, etc. v. Schade (1979) 204 Neb. 209 [281 N.W.2d 756]; Pavesi v. Ford Motor Co. (1978) 155 N.J. Super. 373 [382 A.2d 954]; Erling v. Homera, Inc. (N.D. 1980) 298 N.W.2d 478; McCullough v. Bill Swad Chrysler-Plymouth, Inc. (1983) 5 Ohio St.3d 181 [449 N.E.2d 1289]; Jorgensen v. Pressnall (1976) 274 Ore. 285 [545 P.2d 1382]; Yates v. Clifford Motors, Inc. (1980) 283 Pa.Super. 2293 [423 A.2d 1262]; Vista Chevrolet, Inc. v. Lewis (Tex. App. 1985) 704 S.W.2d 363; Pedrini v. Mid-City Trailer Depot, Inc. (1969) 1 Wn.App. 56 [459 P.2d 76]; Annot., Use of Goods by Buyer as Constituting Acceptance under UCC § 2-606(1)(c) (1975) 67 A.L.R.3d 363.) This consensus is based upon the *898 judicial recognition of practical realities  purchasers of unsatisfactory vehicles may be compelled to continue using them due to the financial burden to securing alternative means of transport for a substantial period of time. (See Johnson v. General Motors Corp., supra, at pp. 1048-1049 [668 P.2d 139 at pp. 143-145]; McCullough v. Bill Swad Chrysler-Plymouth, Inc., supra, at p. 184 [449 N.E.2d 1289 at p. 1293]; Yates v. Clifford Motors, Inc., supra, at pp. 1271-1272.) The seller remains protected through a recoupment right of setoff for the buyer's use of the good beyond the time of revoking acceptance. (See Johnson v. General Motors Corp., supra, at pp. 1049-1051, [668 P.2d 139 at pp. 144-145] and authorities cited.)
(9) We believe California embraces similar views. Nothing in the language of either the Uniform Commercial Code or the Song-Beverly Act suggests that abrogation of the common law principles relating to continued use and waiver of a buyer's right to rescind was intended. The former expressly specifies that "the principles of law and equity... shall supplement its provisions." (Cal. U. Com. Code, § 1103.) The legal principles governing continued use quoted previously are thus still applicable (cf. Troensegaard v. Silvercrest Industries, Inc. (1985) 175 Cal. App.3d 218, 228-229 [220 Cal. Rptr. 712]), as are the rules regulating the equitable right of setoff. (See Jess v. Herrmann (1979) 26 Cal.3d 131, 142-143 [161 Cal. Rptr. 87, 604 P.2d 208]; Kruger v. Wells Fargo Bank (1974) 11 Cal.3d 352, 363 [113 Cal. Rptr. 449, 521 P.2d 441, 65 A.L.R.3d 1266].)
Plaintiff and amicus argue that the instructions were inaccurate statements of law insofar as they told the jury that (1) continued use was incompatible with an effective revocation, and (2) plaintiff had the burden of proving that her continued use of the Cougar did not amount to a waiver of her right to revoke acceptance. These alleged flaws cannot be substantiated from the language of the instructions, but they do appear as matters of reasonable implication. As such, they may furnish the justification for modifications or additions to the instructions at a subsequent retrial.
With respect to the FCAB, the trial court instructed the jury that the FCAB's "decision in this case is not at issue, nor is the Board a party to this lawsuit." Plaintiffs argue that this instruction "was misleading and confusing in suggesting to the jury that the events that took place involving the FCAB had no bearing on the continued use of the vehicle." The instruction is literally correct  the FCAB was not a party and the merits of its decision was not argued by either side. The essence of plaintiff's complaint appears to be that the decision of the FCAB should not preclude her from attempting to show that her continued use did not amount to acceptance of the vehicle or a waiver of her right to revoke. The preceding discussion regarding continued use should show that plaintiff's fears may be assuaged on *899 retrial. Evidence pertinent to the FCAB's operation which the trial court refused to permit plaintiff to introduce at the trial may be reevaluated in light of this opinion.
Plaintiff further contends that the failure of the instructions to define the terms "rejection," "rescission," and "revocation" not only confused the jury, but had the "net effect of ... direct[ing] the jury that [plaintiffs] had accepted the vehicle, thereby precluding relief." We discern no such drastic impact. (10) The concepts of rejection of goods, rescission of a contract, and revocation of acceptance are commonly understood and thus need not be defined. (See Hyatt v. Sierra Boat Co. (1978) 79 Cal. App.3d 325, 340-341 [145 Cal. Rptr. 47].) If plaintiff feels otherwise, the option of requesting definitions remains an option for retrial. (See 7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 265, p. 270.)
Our decision to reverse moots the remainder of contentions pressed by the parties.
The judgment is reversed.
Channell, J., and Perley, J., concurred.
Respondent's petition for review by the Supreme Court was denied January 4, 1990.
NOTES
[1] Although Mrs. Ibrahim's husband Aidar was named as a plaintiff in the complaint, his involvement appears to be purely nominal. In the interests of simplicity we shall therefore treat Mrs. Ibrahim as the sole plaintiff.
[2] The "Warranty Information" provided to plaintiff advised her that if a warranty problem could not be resolved after discussion with the dealer and the nearest "Parts and Service District Office," the buyer could then "contact a Ford Consumer Appeals Board to request an independent third-party review of your case. Please refer to your Owner Guide for detailed information on the Ford Consumer Appeals Boards.... A dispute must be submitted to the Ford Consumer Appeals Board before taking action under the Magnuson-Moss Warranty Act or before pursuing replacement or repurchase remedies provided by certain state laws. This dispute handling procedure does not apply to enforcement of state created rights or other rights which are independent of the Magnuson-Moss Warranty Act or State Replacement or Repurchase laws."
[3] The Albedi dealership was named as a defendant, but it settled with plaintiff prior to the start of the trial.
[4] Statutory references are to the Civil Code unless otherwise indicated.
[5] As will be seen, the core provisions of this statute for present purposes are subdivisions (d) and (e). In order to facilitate clarity of expression we shall refer to these provisions by their subdivision designations. This appeal is governed by section 1793.2 as it read prior to amendments enacted in 1987 which do not affect the substance of our analysis.
[6] As pertinent to this litigation, subdivision (e)(4)(B) defined "[n]ew motor vehicle" to mean "a new motor vehicle which is used or bought for use primarily for personal, family, or household purposes, but does not include motorcycles, motorhomes, or off-road vehicles." The Legislature has recently amended this definition to add dealer-owned "demonstrator" vehicles and certain portions of motorhomes. (Stats. 1988, ch. 697, § 1, p. 2235; Stats. 1987, ch. 1280, § 2, p. 4706.)
[7] During the course of closing arguments to the jury, plaintiff's counsel referred to subdivision (e) creating a "presumption that the car was defective," and counsel for Ford told the jury they must be satisfied "that the defect substantially impaired the use, value and safety" of the vehicle purchased by plaintiff.
[8] (See Barker Bros., Inc. v. Los Angeles (1938) 10 Cal.2d 603, 606 [76 P.2d 97] ["The word `or' is ordinarily used as a disjunctive `that marks an alternative generally corresponding to "either" as "either this or that"'."].)
[9] The trial court had previously instructed the jury with a definition of "manufacturer" and told the jury that "Ford is a manufacturer as here defined." Albedi was identified as a "retail seller."
[10] Plaintiff also contends that the statement read to the jury from the "Warranty Information" confused the jury as to the requirements of the Lemon Law. It is difficult to conceptualize how error can occur when a trial court reads an express warranty within the context of an action for breach of that warranty. Nevertheless, because other instructions compel reversal of the judgment, we leave open the possibility that inclusion of the warranty in instructions may be found inappropriate in the event of retrial.
[11] The jury asked the court, but received no answer, to the question "Can we, the jury, instruct the plaintiff to return the car to Ford if a monetary award is given?" It would be hard to imagine more direct evidence that the jury strongly desired to give some relief to plaintiff.
[12] Hale dealt with former section 789.3, which assessed a penalty of $100 per day against a landlord who willfully deprived a tenant of utility services for the purpose of evicting the tenant. Neither side disputes that section 1794, subdivision (c) qualifies as a penal statute for present purposes.
[13] The trial court declined to use these instructions proffered by plaintiff: "If you find that Defendants [sic] failed to comply with any obligation under the Song-Beverly Consumer Warranty Act or under an express warranty and you determine that the failure to comply was willful, your verdict may include a civil penalty.

"The word `willful', when applied to the intent with which an act is done or omitted and as used in my instructions, implies simply a purpose or willingness to commit the act or to make the omission in question. The word does not require in its meaning any intent to violate the law, or to injure or damage another, or to acquire any advantage."
Plaintiff's definition was substantially identical to that of Penal Code section 7, subdivision 1.
[14] The Code's division pertaining to the sale of goods specifies that "[a]cceptance of goods occurs when the buyer" either "[f]ails to make an effective rejection" or "[d]oes any act inconsistent with the seller's ownership." (Cal. U. Com. Code, § 2606, subds. (1)(b), (1)(c).) It further specifies that "[a]cceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a nonconformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the nonconformity would be seasonably cured but acceptance does not of itself impair any other remedy provided by this division." (Cal. U. Com. Code, § 2607, subd. (2).) Section 2608 of the code provides in relevant part: "(1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it [¶] (a) On the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or [¶] (b) Without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances. [¶] (2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it...."