[No. B079295. Second Dist., Div. Two. Aug. 18, 1995.]

MIKHAIL KROTIN et al., Cross-complainants and Appellants, v. PORSCHE CARS NORTH AMERICA, INC., Cross-defendant and Respondent.

---

**COUNSEL**

Taylor & Hodges, A. Clifton Hodges and Berta Peterson-Smith for Cross-complainants and Appellants.

Robert W. Beck and Kristine J. Exton for Cross-defendant and Respondent.

Lewis, D'Amato, Brisbois & Bisgaard, Jonathon Kaplan, Russell G. Weiss, Carroll, Burdick & McDonough, James W. Henderson, Jr., Geoffrey O. Evers and Joanna R. Mendoza as Amici Curiae on behalf of Cross-defendant and Respondent.

---

**OPINION**

**BOREN, P. J.**—This is an action arising under the Song-Beverly Consumer Warranty Act, Civil Code section 1790 et seq., commonly referred to as California's "lemon law" (hereinafter, the Act). The sole issue on appeal is whether the trial court prejudicially erred in instructing the jury that the lessee of a vehicle "who justifiably rejects or revokes acceptance of a vehicle must do so within a reasonable time after the lessee discovers the grounds for rejection or revocation." We find that to establish breach of warranty obligations under the Act, a formal rejection or revocation of acceptance of the vehicle after discovery of defects or nonconformities is not required, as distinguished from the manufacturer failing to offer restitution or replacement of the vehicle, on its own initiative or upon prompting by the consumer, after a reasonable number of attempts by the manufacturer to remedy the defects at any time during the warranty period. Nonetheless, the erroneous instruction does not warrant reversal, as it was unlikely to have misled the jury and become a factor in its verdict.

## FACTS

■ Since the only contention on appeal relates to a jury instruction, "[i]n assessing an instruction's prejudicial impact, we cannot use the view of the evidence and inferences most favorable to the [prevailing party]. [Citations.] Instead, we must assume the jury might have believed [appellant's] evidence and, if properly instructed, might have decided in [appellant's] favor. [Citations.]" (*Shell Oil Co.* v. *Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 773 [15 Cal.Rptr.2d 815].) Accordingly, we state the facts most favorably to the party appealing the instructional error alleged, in accordance with the customary rule of appellate review. (*Sills* v. *Los Angeles Transit Lines* (1953) 40 Cal.2d 630, 633 [255 P.2d 795].)

On October 3, 1987, Mikhail Krotin and Maya Krotin (hereinafter, the Krotins) signed a 60-month lease for a new 1987 Porsche 944. At the outset, the Krotins experienced problems driving the car in the morning after a cold start. After the car was initially started, it immediately died, and had to be restarted, sometimes several times. The car then proceeded very slowly even if the accelerator was floored. In fact, acceleration after a cold start caused the car to shake. The problem subsided only after driving the car for 10 to 15 minutes. During the first two months of the lease, the Krotins brought the car into the dealership four times for repair of the problem. The dealership kept the car several days for service on each occasion. However, the cold-start problem persisted. As time passed, other problems developed. In November, a metallic sound began emanating from the engine on the front passenger side of the vehicle. Thereafter, the idle speed jumped up and down.

In February of 1988, the Krotins took the car to a different dealership for service regarding the same cold-start problems, as well as engine noise and the failure of the turbo feature to activate properly. The cold-start problems persisted, and the turbo problem still appeared intermittently. In March of 1988, the Krotins brought the car back to the original dealership, complaining again about the cold-start problem and the metallic sound. In April, the car was at the dealership for 11 days. The metallic sound was determined to be a heat shield rattle. But the cold-start problem persisted. In early May, an engineer from Porsche Cars of North America, Inc. (hereinafter, Porsche) recommended replacing the computer, and the manufacturer's corporate headquarters recommended service at a third dealership. The car was at the dealership for five days. Mr. Krotin went to get the car, turned on the ignition with his key, and the engine died. The cold-start problems persisted. In May of 1988, the Krotins orally requested "a buy-back," which the corporate office rejected. At the 30,000-mile scheduled service check in

October of 1989, the Krotins again complained of the cold-start problems, as well as a defective windshield washer, fog light and climate control. For another year, through October of 1990, the Krotins had the car in for service 11 times. The Krotins brought the car to several different dealerships over the years, but the cold-start problems were never repaired.[1]

In January of 1991, the Krotins wrote to Porsche's corporate headquarters, indicated that the car was a lemon and requested their money back. At that time, the car was 39 months old and had approximately 60,000 miles on it. On February 4, 1991, the Krotins also wrote to Porsche Financial Services, with whom they had the lease agreement, and declared, "this will be our last payment, and we revoke acceptance of this vehicle because this vehicle is a lemon." Also in February, the Krotins retained the services of an independent automotive expert, Louis Nanos, who inspected the car at a Porsche dealership and determined, based upon his assessment of a problem with the wiring harness and its relationship to the engine coolant temperature sensor, that the car was "[n]ot driveable." Thereafter, the Krotins kept the car at their house but did not drive it. Approximately nine months later, Porsche Financial Services repossessed the car.

Meanwhile, on March 16, 1991, Porsche Financial Services filed a complaint against the Krotins for recovery of the vehicle and breach of contract. On June 5, 1991, the Krotins filed a cross-complaint against Porsche for, inter alia, breach of express and implied warranty and violation of the Act. On the allegations in the complaint, a stipulated judgment was entered at the time of trial in favor of Porsche Financial Services for $18,293.17, plus costs. As to the cross-complaint, the jury returned a special verdict by a vote of 11 to 1 in favor of Porsche, and judgment was entered against the Krotins. The Krotins appeal.

---

[1] We note that at trial Mr. Krotin was questioned regarding the following interrogatory answer by him: "As indicated in our response, we, in good faith believe, that the subject vehicle never exhibited a cold-start problem on or after May 2nd, 1988; yet, I cannot be sure." On redirect examination Mr. Krotin explained that such statement by him was not accurate, and that prior to that interrogatory response, which was typed by his counsel's office and not read carefully by him, he had also stated, "Deny," when asked to admit that the vehicle never exhibited cold-start problems after May 2, 1988. Moreover, it was later revealed at trial that his counsel's summary of the repair history of the vehicle was apparently taken from a service history of the vehicle which had been compiled in February of 1991 by a district service manager from Porsche who obtained copies of service records from various dealerships to prepare "a lemon law summary analysis."

There was also an inconsistency as to Mrs. Krotin's trial and deposition testimony. In her deposition, she had indicated that the vehicle's stalling did not arise until the last two years of their four-year ownership of the vehicle. At trial, she testified that the condition started to occur during the first year of ownership.

DISCUSSION

I. *Instructional Error*

The Krotins correctly contend that the trial court erred in instructing the jury that "[a] lessee who justifiably rejects or revokes acceptance of a vehicle must do so within a reasonable time after the lessee discovers the grounds for rejection or revocation." The instruction accurately states general principles of commercial law set forth in the California Uniform Commercial Code (hereinafter, Commercial Code).[2] However, the Act, which specifically sets forth procedures when a manufacturer or its representative is unable to service or repair a new vehicle to conform to applicable warranties after a reasonable number of attempts (Civ. Code, § 1793.2, subd. (d)), is unlike the Commercial Code in that it contains no provision which requires rejection or revocation of acceptance of the vehicle within a reasonable time, or any time at all.[3]

The relationship between the Commercial Code and the Act was discussed in *Krieger* v. *Nick Alexander Imports, Inc.* (1991) 234 Cal.App.3d 205 [285 Cal.Rptr. 717]. In 1963, the Legislature enacted the California version of the Uniform Commercial Code, which defined the types of warranties available for consumer purchases and the remedies for breach of warranty. (*Id.* at p. 212.) Remedies for breach of warranty in the Commercial Code include rejecting nonconforming goods, revoking acceptance, and covering by purchase of substitute goods (Com. Code, §§ 2711-2721); but punitive damages are unavailable, and limitations of liability and disclaimers or modifications of warranties are permitted (Com. Code, § 2316). (See *Krieger, supra*, 234

---

[2]Commercial Code section 2602, subdivision (1) provides: "Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller." Acknowledging that nonconformities in goods might be first discovered a substantial time after tender of the goods and rejection is thus no longer possible, Commercial Code section 2608, subdivision (2) provides, in pertinent part: "Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it . . . ." Commercial Code section 2607, subdivision (3)(a) provides: "The buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Accordingly, a buyer who unreasonably delays might lose the right under the Commercial Code to reject or revoke acceptance.

[3]Civil Code section 1793.2, subdivision (d)(2) provides, in pertinent part, as follows: "If the manufacturer or its representative in this state is unable to service or repair a new motor vehicle . . . to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the new motor vehicle . . . or promptly make restitution to the buyer . . . . However, the buyer shall be free to elect restitution in lieu of replacement, and in no event shall the buyer be required by the manufacturer to accept a replacement vehicle."

Cal.App.3d at pp. 212-213.) "These provisions of the code are limited in providing effective recourse to a consumer dissatisfied with a purchase. They make no provision for punitive damages, attorney's fees, consequential damages beyond those attendant to a substitute purchase, or for court supervised performance of warranties. [Citation.]." (*Id.* at p. 213.)

On the other hand, the Act (Civ. Code, §§ 1790-1795.8), enacted in 1970, provides more extensive consumer protections. "The Act regulates warranty terms, imposes service and repair obligations on manufacturers, distributors, and retailers who make express warranties, requires disclosure of specified information in express warranties, and broadens a buyer's remedies to include costs, attorney's fees, and civil penalties. [Citations.] . . . [¶] In 1982, the Legislature added a provision designed to give recourse to the buyer of a new automobile that suffers from the same defect repeatedly, or is out of service for cumulative repairs for an extended period. [Citations.]" (*Krieger* v. *Nick Alexander Imports, Inc.*, *supra*, 234 Cal.App.3d at p. 213.) In 1992, the statutory scheme was structurally modified (Stats. 1992, ch. 1232 (Sen. Bill No. 1762), §§ 6, 7), but it reaffirmed criteria for determining when there has been a "reasonable number of attempts" to repair a new vehicle, and to submit disputes, under certain circumstances, to a "qualified third-party dispute resolution process." (Civ. Code, § 1793.22, subds. (b), (c), (d).)

As to the relationship between the Act and the Commercial Code, it is undisputed that the Act "supplements, rather than supersedes, the provisions of the California Uniform Commercial Code." (*Krieger* v. *Nick Alexander Imports, Inc.*, *supra*, 234 Cal.App.3d at p. 213.) "The provisions of [the Act] shall not affect the rights and obligations of parties determined by reference to the Commercial Code except that, where the provisions of the Commercial Code conflict with the rights guaranteed to buyers of consumer goods under the provisions of [the Act], the provisions of [the Act] shall prevail." (Civ. Code, § 1790.3.) "The remedies provided by [the Act] are cumulative and shall not be construed as restricting any remedy that is otherwise available . . . ." (Civ. Code, § 1790.4.)

In the present case, we must resolve the interplay between the manufacturer's responsibility under the Act to provide prompt restitution or replacement (Civ. Code, § 1793.2, subd. (d)(2)) and the buyer's obligation under the Commercial Code to reject or revoke acceptance of the vehicle a reasonable time after discovery of defects covered under warranty (Com. Code, §§ 2607, subd. (3)(a), 2608, subd. (2)). The Act contains no "reasonable time" requirement by which the consumer must invoke the Act or lose

rights granted by that statutory scheme. Rather, the Act creates an affirmative duty upon the manufacturer or its representative to provide restitution or replacement when a covered defect, i.e. a "nonconformity" (Civ. Code, § 1793.22, subd. (e)(1)), is not repaired after a reasonable number of attempts. As Porsche and amici curiae emphasize, Civil Code section 1794 does bring the Commercial Code into play.[4] Nonetheless, as the conjunctive language in Civil Code section 1794 indicates, the statute itself provides an additional measure of damages beyond replacement or reimbursement (Civ. Code, § 1793.2, subd. (d)) and permits, at the option of the buyer, the Commercial Code measure of damages which includes "the cost of repairs necessary to make the goods conform." (Civ. Code, § 1794, subd. (b)(2).)

Here, at trial the Krotins sought remedies under the Act and not under the Commercial Code, even though in a letter they had formally revoked acceptance when they stopped making payments under the lease. Accordingly, they were not required to reject or revoke acceptance at a reasonable time, or indeed at any time at all.[5]

Amici curiae in the present case urge an appeal to "common sense" in that if a manufacturer, pursuant to the Act, must respond promptly to a consumer's demand for replacement or reimbursement, then the consumer must be under a duty to notify the manufacturer in a reasonable and timely manner of the need for such action. Otherwise, the argument goes, the manufacturer would have to become "clairvoyant" with respect to acknowledging and responding to otherwise unknown claims by consumers. However, as previously discussed, the Act does not *require* consumers to take any affirmative steps to secure relief for the failure of a manufacturer to service or repair a

---

[4]Civil Code section 1794, subdivision (b) provides as follows: "The measure of the buyer's damages in an action under this section shall include the rights of replacement or reimbursement as set forth in subdivision (d) of Section 1793.2, *and the following*: [¶] (1) Where the buyer has rightfully rejected or justifiably revoked acceptance of the goods or has exercised any right to cancel the sale. Sections 2711, 2712, and 2713 of the Commercial Code shall apply. [¶] (2) Where the buyer has accepted the goods, Sections 2714 and 2715 of the Commercial Code shall apply, and the measure of damages shall include the cost of repairs necessary to make the goods conform." (Italics added.)

[5]It is thus unnecessary to take judicial notice of an explanatory document by the California Department of Consumer Affairs which sponsored a prior version of Civil Code section 1794, subdivision (b) (Stats. 1982, ch. 385, § 2, p. 1716) or to delve into the legislative history of this subdivision (see Stats. 1987, ch. 1280, § 4 [specifying that the measure of a buyer's damages under this section shall include replacement or reimbursement "and" Commercial Code remedies]). The language of Civil Code section 1794, subdivision (b) is sufficiently clear and unambiguous as to not require resort to statutory history to determine legislative intent. (See *Wells Fargo Bank* v. *Bank of America* (1995) 32 Cal.App.4th 424, 433-434 [38 Cal.Rptr.2d 521]; *City of Ontario* v. *Superior Court* (1993) 12 Cal.App.4th 894, 901 [16 Cal.Rptr.2d 32].)

vehicle to conform to applicable warranties—other than, of course, permitting the manufacturer a reasonable opportunity to repair the vehicle. The so-called "commonsense" argument arises only because of the disparity between the law as written and reality as it appears in the typical service department of a dealership. In reality, as indicated by the facts alleged at trial by the Krotins, the manufacturer seldom on its own initiative offers the consumer the options available under the Act: a replacement vehicle or restitution. Therefore, as a practical matter, the consumer will likely request replacement or restitution. But the consumer's request is not mandated by any provision in the Act. Rather, the consumer's request for replacement or restitution is often prompted by the manufacturer's unforthright approach and stonewalling of fundamental warranty problems.

An automobile manufacturer need not read minds to determine which vehicles are defective; it need only read its dealers' service records. The Act requires the manufacturer to maintain or to designate and authorize service and repair facilities in the state (Civ. Code, § 1793.2, subd. (a)(1)(A)); i.e., usually, automobile dealerships with service departments. As indicated by the facts in the present case, where a district service manager from Porsche ultimately obtained copies of service records from various dealerships to prepare, as she termed it, "a lemon law summary analysis," a manufacturer is capable of becoming aware of every failed repair attempt. Computerized recordkeeping at dealership service departments could easily facilitate this task, even without any direct contact from the consumer to the manufacturer or any request for replacement or reimbursement to the dealership. It is thus apparent that a manufacturer need not be "clairvoyant"; it need only demonstrate more initiative in honoring warranties.

The Legislature, of course, may change the statutory scheme in question to satisfy the desires of vehicle manufacturers. As it stands now, however, the manufacturer has an affirmative duty to replace a vehicle or make restitution to the buyer if the manufacturer is unable to repair the new vehicle after a reasonable number of repair attempts, and the buyer need not reject or revoke acceptance of the vehicle at any time. The buyer need only provide the manufacturer with a reasonable opportunity to fix the vehicle. Accordingly, the jury instruction complained of which required the lessee in the present case to reject or revoke acceptance within a reasonable time was error.

## II. *No Prejudicial Error*

Although we find instructional error, as discussed above, it does not warrant a reversal of the judgment. "A judgment may not be reversed

for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.) . . . [¶] Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' [Citations.]" (*Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548, 580 [34 Cal.Rptr.2d 607, 882 P.2d 298]; see *LeMons* v. *Regents of University of California* (1978) 21 Cal.3d 869, 875-876 [148 Cal.Rptr. 355, 582 P.2d 946]; *Henderson* v. *Harnischfeger Corp.* (1974) 12 Cal.3d 663, 670 [117 Cal.Rptr. 1, 527 P.2d 353].)

■ In the present case, the critical issue before the jury was whether the problem afflicting the Krotins' Porsche persisted after a reasonable number of attempts to correct it, triggering the replacement or reimbursement provision of the Act. (See *Ibrahim* v. *Ford Motor Co.* (1989) 214 Cal.App.3d 878, 891 [263 Cal.Rptr. 64].) As the Krotins acknowledge on appeal, Porsche's argument in its defense at trial was that the Krotins' complaints were not credible. Porsche impeached the Krotins' testimony based on their responses to interrogatories, and attacked the testimony of their expert witness based on alleged bias and lack of sufficient automotive expertise. The issue at trial was essentially whether Porsche breached its warranty under the Act. The Krotins correctly urge that, if the jury had believed their evidence and was properly instructed, it is reasonably probable it would have found in their favor. (See *Mitchell* v. *Gonzales* (1991) 54 Cal.3d 1041, 1054-1055 [1 Cal.Rptr.2d 913, 819 P.2d 872]; *Shell Oil Co.* v. *Winterthur Swiss Ins. Co.*, *supra*, 12 Cal.App.4th at p. 773.) Nonetheless, it does not reasonably appear that the jury did believe the Krotins' evidence.

During argument to the jury, counsel for Porsche did not refer to the trial judge's instruction regarding rejection/revocation. Rather, counsel argued that the Krotins lacked credibility and that their account exaggerated the mechanical problems and Porsche's intransigence.[6] Counsel suggested that the records of Porsche's dealers constituted a more accurate description of what had occurred, stating that "records don't lie."

The trial court presented the jury with special verdict forms. The last of the special verdict questions asked whether the Krotins had rejected or revoked acceptance within a reasonable time. Counsel did not address this question during argument. Moreover, before reaching that question, the jury

---

[6]Counsel for Porsche did mention in argument that the Krotins had not requested "a buy-back" but had just asked that the car be fixed. However, counsel did not argue that this circumstance was connected to the trial court's instruction regarding rejection/revocation.

was required to specify whether Porsche had breached its express warranty and whether it had breached the implied warranty of merchantibility. As to the two breach of warranty questions, the jury answered "No."[7] Those determinations were wholly separate from the rejection/revocation determination. The breach of warranty questions were thus resolved independently of the rejection/revocation issue, as the trial court apparently intended.[8] Plainly, if Porsche did not breach any warranty, whether or not the Krotins rejected or revoked acceptance of the vehicle within a reasonable time was of no consequence.

We must also assume that the jury's answer to the rejection/revocation question was made in accordance with the trial court's directive that it be made "[r]egardless" of whether or not the warranties had been breached. Thus, the erroneous instruction as to failure to timely reject or revoke acceptance of the vehicle came into play essentially as nothing more than a defense upon which Porsche placed no emphasis in argument. It was never connected to any element necessary to establish breach of warranty. It is therefore not reasonably probable that this sole instructional error "*actually mislead the jury*" (*Soule* v. *General Motors Corp.*, *supra*, 8 Cal.4th at p. 581, fn. 11, italics in original) and became a factor in its verdict.

Equally unpersuasive as a factor in assessing prejudice is the 11-to-1 verdict in favor of Porsche. Even a verdict of 10 to 2 has been deemed "not

---

[7] The relevant special verdict questions were as follows:

"QUESTION NO. 1:

"DID PORSCHE CARS NORTH AMERICA, INC. breach its express warranty to the Plaintiffs under the Song-Beverly Act?

"Answer 'yes' or 'no.': ____No.____

"QUESTION NO. 2:

"DID PORSCHE CARS NORTH AMERICA, INC. breach the implied warranty of merchantability to the Plaintiffs under the Song-Beverly Act?

"Answer 'yes' or 'no.': ____No.____

"If you answer both questions 1 and 2 'No', do not answer any further questions and simply date and sign the verdict form. If you answer either question 1 or 2 'Yes' answer questions 3, 4, 5 and 6.

[Questions 3 through 6 omitted.]

"QUESTION NO. 7:

"Regardless of your answer to the above questions, please answer the following question:

"Did Plaintiffs reject or revoke acceptance of the vehicle within a reasonable time after discovery of the grounds for rejection or revocation?

"Answer: 'Yes' or 'No' ____No."____

[8] We do not perceive a minor ambiguity appearing in special verdict instructions to be of any significance. The jurors were told to answer no further questions if questions 1 and 2 were answered "No" and to then sign and date the verdict form. However, because question 7 requested an answer—"[r]egardless of your answer to the above questions . . ." (i.e., questions 1 through 6.)—the jury apparently answered it anyway. Nothing in that answer suggests that it figured in the jury's determination of the breach issues.

particularly close" (*Mitchell* v. *Gonzales, supra*, 54 Cal.3d at p. 1055), and thus not helpful in assessing the impact of the instructional error. (See *Shell Oil Co.* v. *Winterthur Swiss Ins. Co., supra*, 12 Cal.App.4th at p. 772.) It is therefore not significant in the present case that one of the 11 jurors when polled disagreed with the special verdict as to the finding of no breach of warranty.

Accordingly, the instructional error does not warrant reversal of the judgment.

### DISPOSITION

The judgment is affirmed. Each party is to bear its own on appeal.

Fukuto, J., and Brandlin, J.,* concurred.

A petition for a rehearing was denied September 14, 1995.

---

*Judge of the Municipal Court for the South Bay Judicial District sitting under assignment by the Chairperson of the Judicial Council.