Filed 12/26/24
See dissenting opinion

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| TERRY CARVER,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>VOLKSWAGEN GROUP OF AMERICA, INC., et al.,<br><br>    Defendants and Respondents. | B331076<br><br>(Los Angeles County<br>Super. Ct. No. 22BBCV00368) |

APPEAL from a judgment of the Superior Court of Los Angeles County, John Kralik, Judge.  Affirmed.

The Bravo Law Firm and Nicholas A. Bravo for Plaintiff and Appellant.

Squire Patton Boggs, Sean P. Conboy, Nathaniel K. Fisher, Shaun Kim, and Paul Czer for Defendants and Respondents.

Gutierrez, Preciado & House and Calvin House for Civil Justice Association of California as Amicus Curiae in support of Defendants and Respondents.

_____

Plaintiff Terry Carver appeals from summary judgment entered in favor of defendants Volkswagen Group of America, Inc. (VWGA) and Galpin Volkswagen, LLC (Galpin) (collectively, defendants) on plaintiff's breach of warranty claims arising out of his lease of a new 2021 Volkswagen Atlas (the vehicle). Plaintiff argues that VWGA's prelitigation offer to repurchase the vehicle did not bar plaintiff's claims under the Song-Beverly Act (Civ. Code, § 1790 et seq.)[1] (the Act) for breach of an express warranty and breach of the implied warranty of merchantability.

We conclude defendants satisfied their express warranty duties under the Act by making a prompt, Act-compliant offer of restitution. Therefore, plaintiff cannot succeed on the breach of express warranty claim. We also conclude that plaintiff cannot prove that he suffered any damages from the alleged breach of the implied warranty of merchantability. We thus affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.    VWGA's Offer to Repurchase the Vehicle**

On July 29, 2021, plaintiff leased the vehicle, which had 17 miles on its odometer, from Galpin, an authorized VWGA service facility. On March 3, 2022, plaintiff brought the vehicle, which then had 7,110 miles on the odometer, to Galpin with several complaints about the check engine and airbag lights turning on, the ignition having issues starting, and the doors locking on their own. While the vehicle was at Galpin, a Galpin representative told plaintiff that a part needed to repair the vehicle had been backordered since December 2021.

---

[1]    All subsequent statutory references are to the Civil Code unless indicated otherwise.

On March 9, 2022, plaintiff informed VWGA that the vehicle was at Galpin awaiting a backordered part, and he asked to be reimbursed for his car payments during the time the vehicle was at the dealership. VWGA advised plaintiff that his request for reimbursement of car payments would be reviewed once repairs were completed. The same day, VWGA emailed plaintiff that VWGA would respond regarding the backordered part by close of business on March 15, 2022.

On March 11, 2022, and then twice more in March 2022, VWGA emailed plaintiff to inform him that the backordered part was expected to arrive at Galpin in the next few weeks. VWGA requested a copy of plaintiff's car payment so VWGA could review plaintiff's request for reimbursement after the vehicle was repaired. On March 24, 2022, plaintiff informed VWGA that Galpin was not returning his calls, he wanted the vehicle back, and he would need a new vehicle if the repairs took too long.

On April 5, 2022, plaintiff called VWGA and stated that he wanted VWGA to replace the vehicle if Galpin did not receive the backordered part in the next few days. That same day, VWGA sent plaintiff two emails, the first confirming plaintiff's demand that VWGA repurchase or replace the vehicle, and the second requesting various documents necessary to evaluate plaintiff's demand, including plaintiff's lease agreement and a copy of his payment history.

On April 6, 2022, plaintiff's counsel sent a letter to VWGA expressly exercising plaintiff's right to revoke his acceptance of the vehicle and demanding that VWGA repurchase the vehicle. The demand letter included a copy of the lease agreement for the vehicle and an open repair order from Galpin dated March 3, 2022. The letter stated: "[U]nder California law, our client is

3

entitled to revoke acceptance of the vehicle. Consider this letter an exercise of that right and a request for complete restitution under the Code. . . . [¶] . . . [¶] . . . [I]t is our position that this vehicle clearly qualifies for repurchase under the Act. (Civ. Code §§ 1793.2, 1793.22.)" The demand letter stated: "Please be advised that this offer to resolve this matter on a pre-litigation basis will remain open for a period of 30 days from time of receipt of this correspondence."

On April 25, 2022, VWGA informed plaintiff's counsel via email that VWGA would repurchase the vehicle and asked plaintiff to provide various documents needed to compose the offer. On April 28, 2022, after receiving the requested documents from plaintiff, VWGA sent plaintiff's counsel an offer to repurchase the vehicle.

The financial terms of the repurchase offer included: (1) reimbursement of $8,542.85 to plaintiff; (2) payment of the outstanding lease obligation on the vehicle; and (3) reimbursement of $3,000 for plaintiff's attorney fees as a gesture of goodwill. VWGA calculated the reimbursement amount of $8,542.85 as follows. VWGA added $6,332 (plaintiff's down payment, which included the first month's payment) and $4,626.72 (the total lease payments made through April 2022, excluding the first month's payment). From that sum of $10,958.72, VWGA subtracted a statutory mileage offset of $2,415.87. The offset was calculated by dividing the number of miles plaintiff had driven before presenting the vehicle for repair (7,093 miles) by the vehicle's statutory life expectancy (120,000

4

miles),[2] and multiplying the quotient by the value of the car at the time of the lease as stated in the lease agreement ($40,872.00).[3]

The nonfinancial terms of the repurchase offer included: (1) surrendering the vehicle; (2) signing paperwork legally necessary to complete the transfer and providing VWGA with clear certificate of title; and (3) a confidentiality provision regarding the financial terms. The financial confidentiality provision stated: "In further consideration of VWGA's agreement to repurchase the above-mentioned vehicle, Mr. Terry Carver must keep confidential the financial terms of this agreement, and therefore must not disclose the financial terms to anyone other than their attorney, accountant, or immediate family members. This provision is intended to comply with California Civil Code Section 1793.26, and nothing herein prohibits your client(s) from disclosing to any person the non-financial terms of this

---

[2]     Courts have interpreted the 120,000 miles, which is provided in section 1793.2, subdivision (d) for this calculation, to be the vehicle's useful life expectancy. (*Brady v. Mercedes-Benz USA, Inc.* (N.D. Cal. 2002) 243 F.Supp.2d 1004, 1008 (*Brady*).)

[3]     According to the lease agreement, the vehicle's agreed upon value is $46,872.00, not $40,872.00. VWGA calculated the statutory mileage offset using the lower number because the copy of the lease agreement provided by plaintiff's counsel was "blurry and it appeared that the '6' was actually a '0.' " Plaintiff does not assert any argument on appeal with respect to the error in the use of the lower agreed upon value of the vehicle, but rather argues that the amount payable under the lease should have been used to calculate the offset instead of the value of the vehicle.

agreement or the nature of any alleged problem(s) with the vehicle." The repurchase offer also provided, "[i]f any consequential or incidental damages were incurred (for example, towing or rental car expenses resulting from the alleged nonconformity), please provide documentation as soon as possible, and [VWGA] will follow up with a revised offer if applicable."

In response, on April 28, 2022, plaintiff's counsel requested that VWGA also provide for plaintiff's consideration an alternative "cash and keep" settlement in which VWGA would pay cash but not reacquire the vehicle. VWGA then provided an alternative cash and keep settlement in the amount of $7,500, inclusive of attorney fees and costs.

Plaintiff's counsel also requested that VWGA remove the financial confidentiality provision from the repurchase offer. VWGA responded that it could not "amend the language in the offer letter" because "[t]hese releases are created and approved by [VWGA's] legal team." On May 17, 2022, plaintiff's counsel twice more requested that VWGA's "legal department . . . remove the confidentiality requirement" from the repurchase offer. VWGA repeatedly declined, pointing out that "financial confidentiality is specifically contemplated and permitted by the Act, so there is no reason that it should not be included." Plaintiff did not accept VWGA's repurchase offer.

The repaired vehicle was returned to plaintiff on May 9, 2022. Plaintiff did not pay for the repairs and was given a loaner vehicle during the time his vehicle was at Galpin for repairs. Plaintiff continued to drive the vehicle and was still driving it regularly when the case was in the trial court. He testified at his deposition that since the vehicle was returned, he had not

6

experienced problems with the check engine or airbag lights, the ignition, or the door locks. Plaintiff stated he had been driving the vehicle daily, between 20 to 60 miles per day, and had taken it on some vacations to Big Bear and the Sequoias. He described his use of the vehicle as "relatively normal."

## II. Plaintiff's Lawsuit

On May 25, 2022, plaintiff filed this lawsuit against defendants, asserting under the Act: (1) breach of implied warranty of merchantability, and (2) breach of express warranty of merchantability. Plaintiff alleged that VWGA acknowledged the vehicle qualified for repurchase under the Act but failed "to perform its duty to repurchase the [v]ehicle unless [p]laintiff agrees to keep the terms of the repurchase 'confidential.'" As to the express warranty claim, plaintiff alleged that, "[d]efendants, and each of them, knowing their obligations under Song-Beverly, and despite [p]laintiff's demand, failed and refused to make restitution or replacement according to the mandates of Song-Beverly." Based on this allegation, plaintiff sought "an award of [c]ivil [p]enalty in an amount not to exceed two times [p]laintiff's actual damages." In his prayer for relief, plaintiff also sought replacement or restitution at his election, incidental and consequential damages, "the difference between the value of the [v]ehicle as accepted and the value the [v]ehicle would have had if it had been as warranted," "remedies provided in Chapters 6 and 7 of Division 2 of the Commercial Code," as well as costs and attorney fees.

Defendants filed an answer to the complaint, generally denying the allegations and asserting affirmative defenses based on, among other things, VWGA's prelitigation offer to repurchase the vehicle.

7

## III. Motion for Summary Judgment

Defendants moved for summary judgment or summary adjudication. Defendants argued that plaintiff could not prove beach of express warranty because they promptly offered to repurchase the vehicle. Defendants asserted the mileage offset was properly calculated pursuant to section 1793.2, subdivision (d), and the financial confidentiality provision was permitted under the Act.

Defendants further contended that plaintiff could not prove the breach of implied warranty claim because (1) the vehicle was suitable for ordinary use since plaintiff continued to regularly use the vehicle even after reporting the issues, (2) plaintiff did not revoke acceptance of the vehicle in a reasonable time after discovering the change in the vehicle's condition, and (3) plaintiff could not prove damages. Defendants also argued that plaintiff could not prove his claim for a civil penalty nor seek attorney fees because VWGA complied with the Act and plaintiff therefore could not be the prevailing party.

Plaintiff opposed the motion. With respect to VWGA's prelitigation offer to repurchase the vehicle, plaintiff argued that triable issues of material fact existed regarding whether (1) VWGA properly calculated the mileage offset in the restitution offer; (2) VWGA's offer was prompt; (3) the financial confidentiality provision included in VWGA's offer invalidated the offer; and (4) the prelitigation offer extinguished all warranty claims. At the hearing on the motion, plaintiff asserted he was entitled to rescission for his implied warranty claim, which would allow for a total refund of the money he had spent leasing the vehicle without the $2,415.87 mileage offset.

8

The trial court issued an order granting defendants' motion in its entirety. The trial court ruled that VWGA's April 28, 2022 offer to repurchase the vehicle was prompt and Act-compliant, and the financial confidentiality term was permissible under the statutory scheme. The trial court found that VWGA correctly calculated the mileage offset by using the agreed value of the vehicle. The court reasoned: "The overall goal of the statute is to provide the plaintiff with a return to the *status quo ante*, not to provide a windfall. [Citation.] The legislature did manage to make clear that the full useful life of the vehicle should be considered in making this calculation, as it provided the figure of 120,000 miles for use in the calculation rather than the mileage limit stated in the lease. For the calculation to be a meaningful estimate of depreciation, the full estimate of the value must be used in the equation. What is sought is a reasonable estimate of depreciation. The asset being depreciated is a car, not a stream of payments."

The court concluded that "[t]he offer of restitution was sufficient to address any alleged damage." The court granted summary judgment of plaintiff's two causes of action and did not reach defendants' contentions about the civil penalty and attorney fees.

In May 2023, the trial court entered judgment in favor of defendants. Plaintiff appealed.

## DISCUSSION

Plaintiff argues the court erred in granting summary judgment on his claims for breach of express warranty and breach of implied warranty of merchantability. As we explain below, summary judgment was proper because VWGA made a prompt and Act-compliant offer to repurchase the vehicle. The

9

offer obviated plaintiff's ability to prove that VWGA failed to satisfy its duty to replace/repurchase the vehicle for an express warranty claim. And, under the particular facts of this case, the offer eliminated plaintiff's ability to prove damages for the alleged breach of implied warranty.

## I.    Standard of Review

Summary judgment is designed to cut through the parties' pleadings to determine whether, despite their allegations, trial is necessary to resolve the dispute. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.) A motion for summary judgment shall be granted "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) "[T]he party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact." (*Aguilar*, at p. 850.) A defendant meets its burden of production by showing that the plaintiff cannot establish at least one element of the cause of action. (*Id.* at p. 853.) To do so, the defendant may either present evidence that conclusively negates an element of the plaintiff's cause of action or may present evidence that the plaintiff does not possess, and cannot reasonably obtain, needed evidence. (*Id.* at p. 855.) If defendant meets its burden of production, the plaintiff "is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Id.* at p. 850.)

On appeal from a summary judgment, we review the record de novo to determine whether triable issues of material fact exist. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767.) "In performing an independent review of the granting of summary

judgment, we conduct the same procedure employed by the trial court.  We examine (1) the pleadings to determine the elements of the claim, (2) the motion to determine if it establishes facts justifying judgment in the moving party's favor, and (3) the opposition—assuming movant has met its initial burden—to 'decide whether the opposing party has demonstrated the existence of a triable, material fact issue.' " (*Oakland Raiders v. National Football League* (2005) 131 Cal.App.4th 621, 630.)  "We need not defer to the trial court and are not bound by the reasons in its summary judgment ruling; we review the ruling of the trial court, not its rationale." (*Ibid.*)  In addition, to the extent we consider the trial court's interpretation and application of statutes, we apply de novo review.  (*Carmel Development Co., Inc. v. Anderson* (2020) 48 Cal.App.5th 492, 503.)

## II.    Warranties Under the Act

"The Song–Beverly Consumer Warranty Act was enacted in 1970.  (Stats. 1970, ch. 1333, p. 2478 et seq.)  The Act regulates warranty terms, imposes service and repair obligations on manufacturers, distributors, and retailers who make express warranties, requires disclosure of specified information in express warranties, and broadens a buyer's remedies to include costs, attorney's fees, and civil penalties.  (Civ. Code, §§ 1790–1795.8 . . . .)  It supplements, rather than supersedes, the provisions of the California Uniform Commercial Code.  (Civ. Code, § 1790.3; see also Civ. Code, § 1794, subd. (b), incorporating specific damages provisions of the Cal. U. Com. Code.)" (*Krieger v. Nick Alexander Imports, Inc.* (1991) 234 Cal.App.3d 205, 213.)  The Act " 'is manifestly a remedial measure, intended for the protection of the consumer; it should be given a construction calculated to

11

bring its benefits into action.' " (*Murillo v. Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985, 990.)

Under the Act, a consumer may bring claims for breach of the implied warranty of merchantability (§ 1791.1) and breach of an express warranty (§ 1791.2). "Unless specific disclaimer methods are followed, an implied warranty of merchantability accompanies every retail sale of consumer goods in the state. (§ 1792.) This warranty includes a guarantee that the particular item is 'fit for the ordinary purposes for which such goods are used.' (§ 1791.1, subd. (a)(2).)" (*Music Acceptance Corp. v. Lofing* (1995) 32 Cal.App.4th 610, 619, fn. omitted.) Breach of the implied warranty of merchantability "means the product did not possess even the most basic degree of fitness for ordinary use. (Com. Code, § 2314, subd. (2).)" (*Mocek v. Alfa Leisure, Inc.* (2003) 114 Cal.App.4th 402, 406 (*Mocek*).) "In contrast, an express warranty is a written statement arising out of a sale in which the 'manufacturer, distributor, or retailer undertakes to preserve or maintain the utility or performance of the consumer good or provide compensation if there is a failure in utility or performance[.]' (§ 1791.2, subd. (a)(1).)" (*Music Acceptance Corp.*, at p. 619.)

A fundamental difference between an express warranty claim and an implied warranty of merchantability claim is that before bringing an express warranty claim under the Act, the plaintiff must present the defective vehicle to an authorized representative of the manufacturer for repair and give the manufacturer a reasonable opportunity to fix the vehicle. (*Donlen v. Ford Motor Co.* (2013) 217 Cal.App.4th 138, 152; *Mocek*, *supra*, 114 Cal.App.4th at p. 407 [if "an express warranty is breached, the Act sets out an extensive scheme requiring

12

manufacturers to repair (Civ. Code, § 1793.2), and the buyer has a concomitant duty to allow a reasonable number of opportunities for repair before it can demand a replacement of the goods or reimbursement"].)  If the vehicle cannot be repaired, the manufacturer must offer to replace or repurchase the vehicle from the consumer.  (§ 1793.2, subd. (d).)  However, this aspect of the Act "does not apply to the breach of an implied warranty of merchantability." (*Mocek*, at p. 407.)  Because the defects involved in an implied warranty of merchantability are so fundamental, "the buyer is not required to await a seller's attempt to make repairs." (*Brand v. Hyundai Motor America* (2014) 226 Cal.App.4th 1538, 1548 (*Brand*); § 1794, subd. (a).)

That said, the measure of a consumer's damages for *both* express and implied warranties "include[s] the rights of replacement or reimbursement as set forth in subdivision (d) of Section 1793.2." (§ 1794, subd. (b).)  Section 1793.2 discusses the manufacturer's duties with regard to express warranties, and subdivision (d) sets forth the manufacturer's obligation to replace the vehicle or pay the consumer restitution when the vehicle cannot be repaired after a reasonable number of repair attempts. In addition, where there has been a breach of the implied warranty of merchantability, a consumer who revoked acceptance of the vehicle may cancel the sale and recover the price that has been paid.  (See *Mocek*, *supra*, 114 Cal.App.4th at p. 406 [for breach of implied warranty, buyer's options include rescission when buyer has rightfully rejected or justifiably revoked acceptance of the goods]; §§ 1791.1, subd. (d), 1794 subd. (b)(1) & (2); Com. Code, § 2711.)

13

## III.  There Was No Error in Summarily Adjudicating the Express Warranty Claim

Plaintiff contends the court erred in granting summary adjudication of his express warranty claim.  To succeed on a claim for breach of an express warranty for a vehicle, the buyer plaintiff must prove that (1) the vehicle had a defect or nonconformity covered by a written warranty that substantially impaired the vehicle's use, value, or safety to a reasonable person in plaintiff's shoes (the nonconformity element); (2) the vehicle was presented to an authorized representative of the manufacturer for repair (the presentation element); (3) the manufacturer or its authorized repair facility did not repair the defect after a reasonable number of repair attempts (the failure to repair element); and (4) the manufacturer did not promptly replace or repurchase the vehicle from the plaintiff (the failure to replace or repurchase element).  (CACI No. 3201; § 1793.2; *Donlen v. Ford Motor Co.*, *supra*, 217 Cal.App.4th at p. 152 [listing first three elements]; *Rheinhart v. Nissan North America, Inc.* (2023) 92 Cal.App.5th 1016, 1025 [describing the fourth element].)

The trial court concluded plaintiff could not prove the final element—failure to replace or repurchase—because VWGA made an Act-compliant offer to repurchase the vehicle, which plaintiff declined.  Plaintiff argues this prelitigation offer did not support summary judgment because it (1) was not prompt, (2) miscalculated the use deduction, and (3) incorporated an impermissible confidentiality provision.  We address each of these issues in turn.

14

### a. Promptness

"Section 1793.2, subdivision (d)(2) sets forth the manufacturer's affirmative obligation to 'promptly' repurchase or replace a defective vehicle it is unable to repair." (*Kirzhner v. Mercedes-Benz USA, LLC* (2020) 9 Cal.5th 966, 971.)  However, the Act allows the manufacturer multiple opportunities to repair before this obligation takes effect.  (*Silvio v. Ford Motor Co.* (2003) 109 Cal.App.4th 1205, 1208–1209 ["The statute does not require a manufacturer to make restitution or replace a vehicle if it has had only one opportunity to repair that vehicle."].)  There is no set timeframe for an offer to be "prompt."  However, courts have found offers to be prompt where 40 to 50 days elapsed between the consumers' initial requests for repurchase/replacement and the manufacturers' offers. (*Dominguez v. American Suzuki Motor Corp.* (2008) 160 Cal.App.4th 53, 59 (*Dominguez*) [offer prompt where there was six weeks between the plaintiff's first demand and the manufacturer's offer]; *De Leon v. Ford Motor Co.* (C.D.Cal., Nov. 13, 2019, No. CV 18-7975 PSG (FFMx)) 2019 WL 7195325, at *6 ["Courts have generally found that a manufacturer makes a prompt offer when it is made within fifty days."]; *Medrano v. Volkswagen Group of America, Inc.* (C.D.Cal. July 6, 2012, No. 2:12-cv-02198-SVW-MAN) 2012 WL 12882428 at *3 [45 days between an initial request and an offer to repurchase or replace would be prompt].)

Here, plaintiff verbally asked VWGA to repurchase the vehicle on April 5, 2022.  The next day, plaintiff's counsel sent a demand letter requesting the same and giving VWGA 30 days to respond.  On April 25, 2022, just 20 days after plaintiff's verbal request and before plaintiff's counsel's 30-day deadline to respond

15

had lapsed, VWGA informed plaintiff's counsel that VWGA would repurchase the vehicle. Three days later, on April 28, 2022, after VWGA received the requested documents from plaintiff's counsel, VWGA sent plaintiff the repurchase offer. Thus, only 23 days elapsed between plaintiff's first request for repurchase and VWGA's written offer. As a matter of law, this offer was prompt.

Citing *Krotin v. Porsche Cars North America, Inc.* (1995) 38 Cal.App.4th 294 (*Krotin*), plaintiff contends that because VWGA was aware as early as March 9, 2022 of the vehicle's defects and the delay in obtaining the backordered part, VWGA had a duty to offer to repurchase or replace the vehicle on that date. We need not decide whether VWGA's duty to repurchase arose on March 9, 2022 because even if we analyze promptness based on the 50 days that elapsed from March 9, 2022 to the April 28, 2022 offer, the offer was still prompt. (See *De Leon v. Ford Motor Co.*, *supra*, 2019 WL 7195325, at *6 ["Courts have generally found that a manufacturer makes a prompt offer when it is made within fifty days."].)

In any event, *Krotin* does not support plaintiff's argument. *Krotin*, *supra*, 38 Cal.App.4th at pages 302 to 303, addressed whether, under the Act, a *lessee* who justifiably rejects or revokes acceptance of a vehicle must do so within a reasonable time after discovering the grounds for rejection or revocation. The court explained that "the Act does not *require* consumers to take any affirmative steps to secure relief for the failure of a manufacturer to service or repair a vehicle to conform to applicable warranties—other than, of course, permitting the manufacturer a reasonable opportunity to repair the vehicle. . . . In reality, as indicated by the facts alleged at trial by the [plaintiffs], the manufacturer seldom on its own initiative offers the consumer

16

the options available under the Act:  a replacement vehicle or restitution.  Therefore, as a practical matter, the consumer will likely request replacement or restitution.  But the consumer's request is not mandated by any provision of the Act.  Rather, the consumer's request for replacement or restitution is often prompted by the manufacturer's unforthright approach and stonewalling of fundamental warranty problems." (*Id.* at pp. 302–303.)

Such stonewalling never occurred here.  The undisputed evidence shows that VWGA made efforts to repair the vehicle when it was at Galpin and to regularly communicate with plaintiff.  On March 11, 15, and 24, 2022, VWGA emailed plaintiff to inform him that the backordered part was expected to arrive at Galpin in the next few weeks.  Also on March 11, VWGA requested a copy of plaintiff's lease payments (which plaintiff did not then provide) and reported VWGA would review plaintiff's request for reimbursement after the vehicle was repaired.  On April 5, 2022, the same day plaintiff called VWGA and stated that he wanted VWGA to replace his vehicle, VWGA emailed plaintiff requesting various documents necessary to evaluate plaintiff's demand for repurchase or replacement, including the lease agreement for the vehicle and a copy of the payment history.  Plaintiff did not provide VWGA these documents until VWGA *again* asked for them 20 days later, on April 25, 2024.  Much of the delay in VWGA's offer appears attributable to plaintiff's failure to furnish VWGA with the documents necessary for VWGA to put together a restitution offer.  In light of this timeline of events and the case law showing that even 50 days is a reasonably prompt timeline, we conclude that VWGA's offer to repurchase was indisputably prompt.

17

### b. Use Offset

Plaintiff also contends VWGA did not properly calculate the use offset. We disagree.

Section 1793.2, subdivision (d)(2) states:

"(B) In the case of restitution, the manufacturer shall make restitution in an amount equal to the actual price paid or payable by the buyer, including any charges for transportation and manufacturer-installed options, but excluding nonmanufacturer items installed by a dealer or the buyer, and including any collateral charges such as sales or use tax, license fees, registration fees, and other official fees, plus any incidental damages to which the buyer is entitled under Section 1794, including, but not limited to, reasonable repair, towing, and rental car costs actually incurred by the buyer.

"(C) . . . When restitution is made pursuant to subparagraph (B), the amount to be paid by the manufacturer to the buyer may be reduced by the manufacturer by that amount directly attributable to use by the buyer prior to the time the buyer first delivered the vehicle to the manufacturer or distributor, or its authorized service and repair facility for correction of the problem that gave rise to the nonconformity. The amount directly attributable to use by the buyer shall be determined by multiplying *the actual price of the new motor vehicle paid or payable by the buyer*, including any charges for transportation and manufacturer-installed options, by a fraction having as its denominator 120,000 and having as its numerator the number of miles traveled by the new motor vehicle prior to the time the buyer first delivered the vehicle to the manufacturer or distributor, or its authorized service and repair facility for correction of the problem that gave rise to the nonconformity."

Here, VWGA offered plaintiff a restitution amount of $8,542.85 plus an additional $3,000 in goodwill for attorney fees. VWGA calculated the $8,542.85 as follows: VWGA added $6,332 (the down payment, which included the first month's payment) and $4,626.72 (the total lease payments plaintiff made through April 2022, excluding the first month's payment). From that sum of $10,958.72, VWGA subtracted a statutory mileage offset of $2,415.87. The offset was calculated by dividing 7,093 miles (the number of miles plaintiff had driven the vehicle when he first presented it to an authorized VWGA service facility) by 120,000, and multiplying the resulting figure by $40,872.00 (the agreed upon value of the vehicle at the time of the lease as indicated on the lease agreement).

Plaintiff argues that VWGA's offset was incorrect because "the actual price of the new motor vehicle paid or payable by the buyer" (§ 1793.2, subd. (d)(2)(C)) was not the agreed upon value of the vehicle at the time of the lease ($40,872.00) that VWGA used in its calculations, but rather the total amount due under the lease agreement ($28,703.92). Based on this number, plaintiff argues that the use offset should have been $1,696.64, which is $719.23 less than the amount VWGA used for the offset. Plaintiff cites *Crayton v. FCA US LLC* (2021) 63 Cal.App.5th 194 (*Crayton*) for support.

In *Crayton*, *supra*, 63 Cal.App.5th at page 200, the plaintiff sued the manufacturer for breach of warranty after leasing a new vehicle that developed unrepairable defects. The plaintiff prevailed at trial, and the trial court entered a judgment awarding the plaintiff restitution under the Act. (*Id*. at pp. 201–202.) The plaintiff appealed, arguing that the trial court erred by excluding from its restitution award the residual value of the

leased car (i.e., the amount necessary for plaintiff to purchase the vehicle). (*Id.* at p. 203.) The *Crayton* court held that the phrase "actual price paid or payable by the buyer" as used in section 1793.2, subdivision (d)(2)(B) did not include the residual value of the leased vehicle because the lease "did not require plaintiff to acquire title to the vehicle at the end of the lease." (*Crayton*, at p. 204.) The court stated that to conclude otherwise would "be contrary to the Legislature's intent in using the term restitution to describe a lessee's damages remedy under the Act." (*Id.* at p. 205.)

Notably, *Crayton* did not analyze the phrase at issue in this appeal. Rather, *Crayton* construed a similar but different phrase that appears in the preceding paragraph of section 1793.2, wherein the Legislature stated, "the manufacturer shall make restitution in an amount equal to the actual price paid or payable by the buyer." (§ 1793.2, subd. (d)(2)(B).) The *Crayton* court explained that the plaintiff could not recover more in actual damages than the plaintiff was required to pay under the lease agreement. (*Crayton*, *supra*, 63 Cal.App.5th at pp. 201–202.)

In contrast, we are tasked with interpreting the language that describes the use offset: "The amount directly attributable to use by the buyer shall be determined by multiplying *the actual price of the new motor vehicle paid or payable by the buyer*, including any charges for transportation and manufacturer-installed options, by a fraction having as its denominator 120,000 and having as its numerator the number of miles traveled by the new motor vehicle prior to the time the buyer first delivered the vehicle to the manufacturer or distributor, or its authorized service and repair facility for correction of the problem that gave rise to the nonconformity." (§ 1793.2, subd. (d)(2)(C), italics

20

added.)  The key difference between the language at issue in *Crayton* and at issue here is that "the actual price of the new motor vehicle" precedes "paid or payable by the buyer."  (§ 1793.2, subd. (d)(2)(C).)  The actual price of the *new* vehicle is pertinent to the offset because the objective of this paragraph is to calculate the value of plaintiff's use within the context of 120,000 miles, which courts have interpreted to be the vehicle's useful life expectancy.  (See e.g. *Brady*, *supra*, 243 F.Supp.2d at p. 1008; *Hernandez v. Ford Motor Co.* (C.D.Cal., Aug. 5, 2022, No. CV 22-03361 MWF (KSx) 2022 WL 3135916, at *3.)  The lease's total value is irrelevant to such a computation.

As the court in *Brady*, *supra*, 243 F.Supp.2d at pages 1008–1009, explained:  "[T]he pro-rated off-set in subsection (C) is based not on the lease mileage allowance . . . or length of the lease term, but on 120,000 miles which presumptively reflects the full life expectancy of a new car.  If the offset under subsection (C) is calculated based on the vehicle's pro-rated depreciation over the full 120,000 life expectancy, it makes sense to apply that pro-ration to the full purchase price of the vehicle.  Moreover, using the full purchase price in calculating the pro-rated offset is consistent with the fact that lease payments typically reflect a component for depreciation of the automobile based on its full life expectancy and purchase price."  We agree with the *Brady* court's construction and conclude there was no error in using the agreed upon value of the vehicle as reflected in the lease to calculate the mileage offset.

### c. *Confidentiality Provision*

Plaintiff argues that VWGA's offer was not Act-compliant because it required plaintiff to agree not to disclose the financial terms of the buyback offer.  Specifically, plaintiff asserts that

21

although section 1793.26 permits financial confidentiality in buyback agreements, the Act does not permit a manufacturer to *condition* a buyback or restitution offer on financial confidentiality. We disagree.

"Our primary task when faced with a question of statutory construction is to determine the intent of the Legislature, and we begin by looking to the statutory language. (*Olson v. Automobile Club of Southern California* (2008) 42 Cal.4th 1142, 1147.) We must give 'the language its usual, ordinary import and accord[ ] significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. A construction making some words surplusage is to be avoided. The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible.' [Citation.] If the statutory language is susceptible of more than one reasonable interpretation, we must look to additional canons of statutory construction to determine the Legislature's purpose. [Citation.] 'Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent.' " (*McCarther v. Pacific Telesis Group* (2010) 48 Cal.4th 104, 110.)

Section 1793.26 prohibits certain kinds of confidentiality provisions in automobile repurchase agreements. Specifically, section 1793.26, subdivision (a) prohibits "[a]ny automobile manufacturer, importer, distributor, dealer, or lienholder who reacquires, or who assists in reacquiring, a motor vehicle" from:

"(1) Requiring, as a condition of the reacquisition of the motor vehicle, that a buyer or lessee who is a resident of this

22

state agree not to disclose the problems with the vehicle experienced by the buyer or lessee or the nonfinancial terms of the reacquisition.

"(2) Including, in any release or other agreement, whether prepared by the manufacturer, importer, distributor, dealer, or lienholder, for signature by the buyer or lessee, a confidentiality clause, gag clause, or similar clause prohibiting the buyer or lessee from disclosing information to anyone about the problems with the vehicle, or the nonfinancial terms of the reacquisition of the vehicle by the manufacturer, importer, distributor, dealer, or lienholder." (§ 1793.26, subd. (a).)

Section 1793.26, subdivision (a) thus prohibits vehicle manufacturers from doing two related but distinct things. First, a manufacturer may not *condition* vehicle reacquisition on a consumer's promise not to disclose the vehicle's mechanical problems. Second, a manufacturer may not *include* in a vehicle buy-back agreement a clause prohibiting a consumer from disclosing the vehicle's mechanical problems.

Section 1793.26, subdivisions (b) and (c) expand on and clarify the prohibitions of subdivision (a). Subdivision (b) says that any prohibited confidentiality clause—that is, any clause that prohibits a consumer from disclosing a lemon vehicle's mechanical problems—"shall be null and void as against the public policy of this state." Subdivision (c) limits the scope of prohibited nondisclosure clauses; it says: "Nothing in this section is intended to prevent any confidentiality clause, gag clause, or similar clause regarding *the financial terms* of the reacquisition of the vehicle." (§ 1793.26, subd. (c), italics added.)

Plaintiff concedes that section 1793.26, subdivision (c) permits financial confidentiality in buyback agreements, but he

contends that the Act does not permit a manufacturer to condition a buyback or restitution offer on financial confidentiality.  We do not agree.  Our conclusion "follows from two principles of statutory construction.  One principle assumes that every part of a statute serves a purpose and that nothing is superfluous.  The other principle, commonly known under the Latin name of *expressio unius est exclusio alterius*, is that the expression of one thing in a statute ordinarily implies the exclusion of other things."  (*In re J.W.* (2002) 29 Cal.4th 200, 209; see also *Lopez v. Sony Electronics, Inc.* (2018) 5 Cal.5th 627, 635– 636 [" 'Under the maxim of statutory construction, *expressio unius est exclusio alterius*, if exemptions are specified in a statute, we may not imply additional exemptions unless there is a clear legislative intent to the contrary.' "]; *In re Bryce C.* (1995) 12 Cal.4th 226, 231 ["Generally, the expression of some things in a statute implies the exclusion of others not expressed."].)

Had the Legislature intended to prohibit vehicle manufacturers from conditioning repurchase on confidentiality provisions of any kind, it would have been an easy matter to say so.  Instead, it adopted a much more limited reacquisition prohibition:  It said that manufacturers may not condition repurchase of lemon vehicles on a consumer's promise not to disclose the vehicle's *mechanical problems*, and it clarified that the section was not intended to prevent any confidentiality clause regarding the *financial terms* of a vehicle's reacquisition. Reading these clauses together, as we must, the most reasonable

24

interpretation of the statute is that repurchase offers *may* be conditioned on financial nondisclosure agreements.[4]

We note that the *expressio unius est exclusio alterius* principle should not be invoked " 'if its operation would contradict a discernible and contrary legislative intent.' " (*In re J.W.*, *supra*, 29 Cal.4th at p. 209; see also *Greisman v. FCA US, LLC* (2024) 103 Cal.App.5th 1310, 1324 ["*Expressio unius est exclusio alterius* 'is not applied in isolation, without regard to "legislative history or other evidence of legislative intent," but rather must be considered with regard to "other indicia of legislative intent." ' "].) In the present case, the legislative history strengthens, rather than undermines, our conclusion. Committee reports prepared in connection with section 1793.26's adoption reflect that the Legislature enacted the section in 1998 to address the inclusion of confidentiality clauses in lemon law settlement and buyback agreements.

Bill supporters noted that under existing law, some vehicle manufacturers were using confidentiality clauses to avoid requirements that purchasers of "lemon" vehicles receive written notice of buyback. Specifically, committee reports pointed to "recent media stories detailing the practice of some auto resellers: first they sell a known 'lemon' to a shill buyer, with the LEMON

---

[4] The dissent suggests that it would be anomalous if the Act permitted a manufacturer to deny relief because a consumer refused to agree to terms not set forth in section 1793.2, subdivision (d). (Dis. opn., *post*, at p. 4.) But as the dissent acknowledges, the statute undoubtedly permits manufacturers to include *some* terms not detailed in the statute, such as predicating repurchase on the consumer's transfer of title to a lemon vehicle. (*Id.* at p. 6, fn. 3.)

25

notice on the Title intact, and then repurchase the same vehicle gaining a clean [t]itle (hence the term 'Title laundering.')  That vehicle is then placed on the market to be purchased by an unsuspecting consumer.  The author asserts that when the auto manufacturer places a 'gag' on the original owner, it hinders such fraud from discovery.  This is particularly troubling when the defect is a matter of safety, such as chronically faulty brakes." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2410 (1997–1998 Reg. Sess.), June 23, 1998 (<https://www.leginfo.ca.gov/pub/97-98/bill/asm/ab_2401-2450/ab_2410_cfa_19980624_104024_sen_comm.html> [as of Dec. 26, 2024], archived at <https://perma.cc/9PBF-K9NU>).)  These reports "come in the context of a larger issue, which is the fraudulent 'title laundering' of automobiles considered to be lemons."  (Sen. Rules Com., Off. of Sen. Floor Analysis, Third Reading, Assem. Bill No. 2410 (1997–1998 Reg. Sess.), as amended July 6, 1998, p. 3.)  Accordingly, the bill was intended to preclude " 'irresponsible auto manufacturers [from] evad[ing] accountability for their defective products and . . . perpetuat[ing] the likelihood that future consumers will be endangered by the same products.' "  (*Id.* at p. 4.)  However, the bill analysis makes clear that "nothing in this bill [was] intended to prevent any confidentiality clause, gag clause, or similar clause regarding the financial terms of the reacquisition of the vehicle."  (*Id.* at p. 2.)

This legislative history evidences that the Legislature's objective in prohibiting certain nondisclosure terms was to inhibit manufacturers from "laundering" repurchased vehicles by eliminating lemon notices from their title.  Given that financial terms of a manufacturer's repurchase offer are unrelated to vehicle safety, the legislative history supports our conclusion that

26

the Legislature did not intend to prohibit repurchase offers conditioned on financial confidentiality provisions.

We note, moreover, that while the statute does not require manufacturers to settle lemon law claims in advance of litigation, its provisions plainly encourage out-of-court settlements by prescribing most of the terms of lemon buybacks. That is, the statute says that if a vehicle manufacturer cannot promptly repair a vehicle, it must either "replace[ ]" the vehicle and pay for any fees the buyer incurs in connection with replacement, plus incidental damages (§ 1793.2, subd. (d)(2)(A)), or "make restitution in an amount equal to the actual price paid or payable by the buyer," (*id.*, subd. (d)(2)(B)) plus incidental damages, less "an amount directly attributable to use by the buyer" (*id.*, subd. (d)(2)(C)). The statute also specifies exactly how the use reduction must be calculated: By "multiplying the actual price of the new motor vehicle paid or payable by the buyer . . . by a fraction having as its denominator 120,000 and having as its numerator the number of miles traveled by the new motor vehicle prior to the time the buyer first delivered the vehicle to the manufacturer or distributor, or its authorized service and repair facility for correction of the problem that gave rise to the nonconformity." (*Ibid.*) The Legislature precisely detailed the manufacturer's repurchase obligations in order to simplify negotiations and reduce the need for litigation to resolve lemon law claims.

Furthermore, to enforce this prelitigation resolution framework, the Act imposes significant penalties on manufacturers who fail to comply, including prevailing party attorney fees and civil penalties of up to two times the consumer's damages. (§ 1794, subds. (d) & (e)(1).) These penalties

27

underscore the Legislature's intent to incentivize manufacturers to fulfill their obligations promptly, thus avoiding costly and time-consuming litigation. Against this backdrop, it would be anomalous if the Legislature intended negotiations about financial nondisclosure terms—which the statute expressly permits—to derail lemon buybacks, thereby increasing litigation and delaying consumer recovery. We therefore conclude that the Legislature intended to allow vehicle manufacturers to condition lemon buybacks on the purchaser's consent to financial nondisclosure terms.

Plaintiff argues that requiring him to agree to this financial confidentiality provision was against the spirit of the Act, which is intended to protect the consumer. We disagree. The Act's objectives are to make the consumer whole and protect the consumer from meaningless warranties and "lemon" vehicles. (See *Mega RV Corp. v. HWH Corp.* (2014) 225 Cal.App.4th 1318, 1333 ["The Act 'was enacted to address the difficulties faced by consumers in enforcing express warranties. Consumers frequently were frustrated by the inconvenience of having to return goods to the manufacturer for repairs and by repeated unsuccessful attempts to remedy the problem. [Citation.] The Act protects purchasers of consumer goods by requiring specified implied warranties, placing strict limitations on how and when a manufacturer may disclaim those implied warranties, and providing mechanisms to ensure that manufacturers live up to the terms of any express warranty.' "].) The consumer's ability to tell others how much the manufacturer paid in restitution does nothing to further the Act's objectives.

Plaintiff also asserts that the confidentiality provision is unsupported by consideration because "no additional

28

consideration was offered by VWGA in exchange for confidentiality." But plaintiff offers no authority for the proposition that any additional compensation was required for a contract term permitted by the statute. And, in any event, VWGA did offer additional consideration—namely, $3,000 in attorney fees, which was not required under the Act because the offer occurred prior to litigation. (§ 1794, subd. (d) [attorney fees included in award where plaintiff *prevails* in an action].)

For all the foregoing reasons, we conclude VWGA's prelitigation offer was Act-compliant. Plaintiff's breach of express warranty cause of action fails as a matter of law because plaintiff cannot prove the failure to replace or repurchase element. (See e.g., *Dominguez, supra*, 160 Cal.App.4th at p. 59 [granting summary judgment on express warranty claim where the manufacturer made an Act-compliant offer and the plaintiff "did not file suit to require [manufacturer] to comply with Song-Beverly" but rather "to recover the civil penalty and/or attorney fees"].)

## IV. There Was No Error in Summarily Adjudicating the Implied Warranty of Merchantability Cause of Action

Plaintiff next argues that the court erred by summarily adjudicating his claim for breach of the implied warranty of merchantability. The elements for this claim are lack of merchantability, causation, and damages. (*Gutierrez v. Carmax Auto Superstores California* (2018) 19 Cal.App.5th 1234, 1246–1247; CACI No. 3210; § 1794.) "Merchantability, as pertinent here, means that the goods '[p]ass without objection in the trade under the contract description,' and are 'fit for the ordinary

29

purposes for which such goods are used.' (§ 1791.1, subd. (a).)"[5] (*Brand*, *supra*, 226 Cal.App.4th at p. 1545.) " ' "The core test of merchantability is fitness for the ordinary purpose for which such goods are used." ' " (*Mexia v. Rinker Boat Co., Inc.* (2009) 174 Cal.App.4th 1297, 1303.) An unmerchantable vehicle is typically unsafe or not suitable for ordinary use. (*Brand*, at p. 1546.)

Pursuant to section 1794, subdivision (a), "Any buyer of consumer goods *who is damaged* by a failure to comply with any obligation . . . under an implied or express warranty or service contract may bring an action for the recovery of damages and other legal and equitable relief." (§ 1794, italics added.) Thus, "the statute contemplates that a buyer must have been damaged to bring an action under Song-Beverly." (*Duff v. Jaguar Land Rover North America, LLC* (2022) 74 Cal.App.5th 491, 504–505; *Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 121 [same], disapproved on another ground in *Rodriguez v. FCA US LLC* (2024) 17 Cal.5th 189, 205.) Section 1794, subdivision (b) further provides: "The measure of the buyer's damages in an action under this section shall include the rights of replacement or reimbursement as set forth in subdivision (d) of Section 1793.2."

We have already discussed section 1793.2 subdivision (d) at length above in the context of express warranties. It provides that where the manufacturer cannot repair the defect, it "shall

---

[5]     Though not relevant to the sale of this vehicle, we note that the Act also defines merchantable goods as goods that "[a]re adequately contained, packaged, and labeled" and "[c]onform to the promises or affirmations of fact made on the container or label." (§ 1791.1, subd. (a).)

30

either replace the goods or reimburse the buyer in an amount equal to the purchase price paid by the buyer, less that amount directly attributable to use by the buyer prior to the discovery of the nonconformity." (§ 1793.2, subd. (d)(1).) Even in the context of breach of an implied warranty, "a buyer's measure of damages . . . [are] calculated at the time the buyer *learns of the breach*. (See § 1794, subd. (b)(1), citing Cal. U. Com. Code, § 2713.) Accordingly, a buyer seeking to repudiate a contract for an asserted warranty breach arising well after sale or delivery is not . . . entitled to a full refund and free use of the goods until that point, but rather a damages remedy consistent with the severity of the problem and when it arose, including . . . a prorated return." (*Brand*, *supra*, 226 Cal.App.4th at p. 1549.)

Assuming without deciding that the implied of warranty of merchantability was breached, plaintiff cannot prove damages. As explained above, prior to litigation, VWGA offered plaintiff all the restitution he could recover under section 1793.2, subdivision (d). It was plaintiff's choice, not VWGA's, to refuse that offer in order to allege damages to support this lawsuit and seek civil penalties and attorney fees. Thus, defendants have not damaged plaintiff.

We are not holding that the manufacturer's failure to replace or refund the consumer is an element of breach of implied warranty claim, as it is for an express warranty claim. Rather, we are concluding that under the specific facts of this case and given VWGA's prompt, Act-compliant restitution offer that significantly exceeded the restitution amount required by the Act, plaintiff cannot prove damages to support his breach of implied warranty cause of action.

31

Plaintiff argues he is entitled to a full refund without the use deduction because he may seek "rescission" for his breach of the implied warranty claim. (See *Mocek*, *supra*, 114 Cal.App.4th at p. 406 [for breach of implied warranty, buyer's options include rescission when buyer has rightfully rejected or justifiably revoked acceptance of the goods]; §§ 1791.1, subd. (d), 1794, subd. (b)(1) & (2); Com. Code, § 2711.) However, even if plaintiff were entitled to the full value he paid without the use offset,[6] he still cannot prove he incurred any damages. Because VWGA was not required to offer attorney fees prelitigation, VWGA's restitution offer was $3,000 greater than the restitution amount statutorily required under the Act. As the use offset was only $2,415.87, VWGA's offer still exceeded what plaintiff could have received in damages by way of rescission.

---

[6] It is unclear whether plaintiff would be entitled to the full value paid if he sought rescission. (See *McCoy v. West* (1977) 70 Cal.App.3d 295, 302–303 [The "fundamental object of rescission is to restore the parties as far as possible to the economic position they occupied before they entered into the contract. . . . .[T]he guilty vendor is not fully restored to his original economic position unless compensation is made for the use of the subject matter for the period during which the innocent vendee was in possession."]; *Kudokas v. Balkus* (1972) 26 Cal.App.3d 744, 754 ["In selecting a remedy for breach of the contract, the vendor has a choice between rescission and enforcement. Conceivably, rescission and restoration of the vendee's payments would put the vendor in a position to recover use value."]; *Warfield v. Richey* (1959) 167 Cal.App.2d 93, 97–98 [defrauded vendee may elect to rescind contract, restore possession to the vendor, and recover the purchase money paid less the fair rental value for the use of the property during his occupancy].)

Without damages, plaintiff cannot succeed on a claim for breach of the implied warranty of merchantability.  The trial court therefore properly granted summary judgment.

### DISPOSITION

The judgment is affirmed.  Defendants and respondents Volkswagen Group of America, Inc. and Galpin Volkswagen, LLC are awarded their costs on appeal.

### CERTIFIED FOR PUBLICATION

EDMON, P. J.

I concur:

HANASONO, J.*

---

\*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**Adams, J., Dissenting.**

I respectfully dissent.

Civil Code section 1793.2, subdivision (d)(2) sets forth the precise requirements for restitution when the manufacturer does not repair a vehicle to conform to applicable express warranties after a reasonable number of attempts.[1]  It is undisputed that Volkswagen Group of America, Inc. (VWGA) did not in fact provide restitution consistent with section 1793.2, subdivision (d)(2).  Instead, VWGA sought summary judgment on the ground that it *offered* to provide restitution consistent with the statute, but Carver refused to accept the offer.  VWGA's offer was not one of unconditional readiness to comply with what the statute required assuming restitution was owed.  Rather, VWGA asked Carver to agree to keep the financial terms of the offer confidential and, when Carver refused, VWGA did not indicate it would nonetheless comply with section 1793.2, subdivision (d)(2).  No restitution was paid.  In my view, on these facts, VWGA was not entitled to summary judgment on the ground that Carver cannot establish damages under the Act.

There can be no dispute that section 1793.26, subdivision (c) does not prohibit confidentiality clauses regarding the financial terms of the reacquisition of a vehicle pursuant to section 1793.2, subdivision (d).  The language of section 1793.26, subdivision (c) is clear and unambiguous on that point.  What is less clear is whether, by not *preventing* such provisions, the Legislature intended to allow manufacturers to *require* that a

---

[1]     All further undesignated statutory references are to the Civil Code.

consumer agree to such provisions in order to receive the restitution the statute otherwise mandates the manufacturer provide. On this point, I disagree with the majority.

As the majority explains, when interpreting a statute, if the language is susceptible to more than one reasonable interpretation, we may consider extrinsic aids, including " 'the ostensible objects to be achieved,' " and also " 'the evils to be remedied, the legislative history, public policy . . . and the statutory scheme of which the statute is a part.' [Citation.]" (*Hoechst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 519.) To harmonize sections 1793.26, subdivision (c) and 1793.2, subdivision (d), I would consider the public policy underlying the Act as a whole and the manner in which courts have construed its provisions. Recently, the California Supreme Court explained in interpreting a different provision of the Act: "We also keep in mind that the Act is ' "manifestly a remedial measure, intended for the protection of the consumer; it should be given a construction calculated to bring its benefits into action." ' [Citations.]" (*Niedermeier v. FCA US LLC* (2024) 15 Cal.5th 792, 804 (*Niedermeier*).)

In *Niedermeier*, the court considered whether a restitution award under section 1793.2, subdivision (d)(2) is reduced by the amount a consumer receives after trading in or selling a defective vehicle. Although the legislative history revealed little regarding the meaning of relevant terms, the court considered the development of the Act as a whole. The court explained: "The evolution of the Act also indicates a legislative intent to ensure buyers receive full compensation under the Act, to make it easier for buyers to access all the benefits to which they are entitled under applicable warranties, and to constrain manufacturers

2

from evading their statutory obligations. To this end, since its enactment, the Act 'has been amended numerous times to broaden its consumer protection policy, expand the classes of vehicles to which the lemon law applies, lessen the types of defenses that can [be] asserted, and change the statutory text in response to appellate decisions.' [Citation.] This counsels against reducing statutory restitution awards by trade-in credits or sales proceeds, when such reductions are not enumerated or authorized in section 1793.2, subdivision (d). Any such reduction would be inconsistent with the legislative history and the Act's consumer protective purpose." (*Niedermeier*, *supra*, 15 Cal.5th at pp. 816–817.)

It may be that allowing a consumer to discuss the financial terms of a manufacturer's reacquisition of a vehicle under section 1793.2, subdivision (d), is not obviously related to the Act's purpose. Yet, allowing a manufacturer to avoid complying with statutory mandates under the Act by insisting on the consumer's agreement to an extraneous term the statute permits, but does not require, would seem to be entirely at odds with the Act's consumer protective purpose.

Indeed, it is inconsistent, at least in principle, with other interpretations of section 1793.2, subdivision (d). For example, in *Krotin v. Porsche Cars North America, Inc.* (1995) 38 Cal.App.4th 294, the court explained "the Act creates an affirmative duty upon the manufacturer or its representative to provide restitution or replacement when a covered defect, i.e. a 'nonconformity' (Civ. Code, § 1793.22, subd. (e)(1)), is not repaired after a reasonable number of attempts." (*Id.* at p. 302.) "[T]he Act does not *require* consumers to take any affirmative steps to secure relief for the failure of a manufacturer to service or repair

3

a vehicle to conform to applicable warranties—other than, of course, permitting the manufacturer a reasonable opportunity to repair the vehicle. . . . [T]he manufacturer seldom on its own initiative offers the consumer the options available under the Act: a replacement vehicle or restitution.  Therefore, as a practical matter, the consumer will likely request replacement or restitution.  But the consumer's request is not mandated by any provision in the Act." (*Id.* at pp. 302–303; cited with approval in *Niedermeier*, *supra*, 15 Cal.5th at p. 818; see also *Lukather v. General Motors, LLC* (2010) 181 Cal.App.4th 1041, 1049–1050 [rejecting argument that consumer had a duty to select replacement or restitution before manufacturer had a duty to act promptly, citing *Krotin*].)

It would be anomalous if, despite not requiring that a consumer take *any* affirmative steps to obtain relief, the Act also permitted a manufacturer to *deny* that relief entirely if the consumer refuses to agree to terms that are not set forth in section 1793.2, subdivision (d).[2]

Of course, while section 1793.2, subdivision (d), does not include a requirement that the consumer agree to keep financial conditions confidential if the manufacturer so demands, the Act

---

[2]     As counsel noted at oral argument, the Legislature has enacted new statutory provisions that are intended to reduce litigation and may change the landscape with respect to prelitigation offers in lemon law cases.  (Assem. Bill No. 1755 (2023–2024 Reg. Sess.) [enacting Code Civ. Proc., §§ 871.20– 871.28, eff. Jan. 1, 2025 and Apr. 1, 2025 (§ 871.24)].)  However, the new laws have not yet gone into effect and we are bound to apply the law as it was during the relevant time periods in this case.

4

expressly indicates in section 1793.26, subdivision (c), that it does not *prevent* confidentiality provisions regarding financial terms in settlement or reacquisition agreements. But nothing in the language of that provision or in the legislative history demonstrates the Legislature intended to allow manufacturers to *withhold* the restitution required by law if a consumer does not agree to a permissible confidentiality provision.

Section 1793.26 was enacted to curtail the use of confidentiality provisions that enabled auto sellers to resell a "lemon" to a new buyer without disclosing the vehicle's prior defects. As explained in one analysis of Assembly Bill No. 2410 (1997–1998 Reg. Sess.), "[i]n a standard lemon buyback or settlement agreement, the vehicle manufacturer agrees to repurchase a vehicle from a consumer to avoid future lemon law or related litigation. Some automobile manufacturers include in their agreements 'gag' or confidentiality clauses. The author's office indicates that the bill is intended to prohibit gag or confidentiality clauses in lemon law settlement and buyback agreements." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2410 (1997–1998 Reg. Sess.) June 23, 1998.) This and other portions of the legislative record indicate that Assembly Bill No. 2410 was concerned with settlement or other agreements reached between the consumer and manufacturer, not the consumer's or manufacturer's basic obligations under section 1793.2, subdivision (d).

Offering to settle a lemon law claim is not necessarily the same as complying with the Act. Neither the manufacturer nor the consumer is required to *settle* a claim in advance of litigation, but the manufacturer *is* required to comply with the Act's

5

restitution provisions.[3]  If the parties are unable to reach a settlement, the manufacturer is not excused from complying with the statute if such compliance is owed.  In this case, I would not conclude that VWGA has demonstrated Carver cannot establish an element of his claim under the Act because VWGA *offered* to comply with the statute, but did not do so because Carver rejected the additional confidentiality term VWGA demanded in exchange.

There may be other repercussions that flow from a consumer's decision to reject an otherwise reasonable and statutorily permissible settlement offer.  (See, e.g., § 1794; cf. *Goglin v. BMW of North America, LLC* (2016) 4 Cal.App.5th 462, 471–472 [rejecting defense argument that consumer was not entitled to attorney fees because she unreasonably refused to accept prelitigation settlement offer; offer had unfavorable aspects, including an unlawful confidentiality clause]; *Gezalyan v. BMW of North America LLC* (C.D.Cal. 2010) 697 F.Supp.2d 1168, 1170 [rejecting defense argument that consumer was not entitled to attorney fees because she rejected prelitigation offer to repurchase care; offer required among other things that she keep financial terms of settlement confidential; consumer ultimately won repurchase of vehicle without any of the conditions manufacturer proposed in offer].)  But the trial court's order was not limited to summary adjudication regarding those

---

[3]      Some terms may be necessary for a manufacturer to provide the restitution required under the Act, such as the consumer's participation in transferring title to the vehicle, or providing information about incidental expenses to be reimbursed.  (§ 1793.2, subd. (d)(2)(A).)  Keeping financial terms confidential is not that type of intrinsically necessary condition.

repercussions, such as Carver's entitlement to a civil penalty or attorney fees.  Instead, VWGA asked the trial court to determine as a matter of law that Carver could not prevail on his claim for restitution required by the Act, even if his car was a "lemon," because he refused a settlement offer that included a confidentiality provision he did not wish to sign.  I believe this argument runs afoul of the language and purpose of the Act.  Therefore, I respectfully dissent.


ADAMS, J.

7